244

Irving and Charlotte RADOL, A. James Ibold, Dwight C. Baum, the Crossett Charitable Foundation, Reuben B. Fishbein, Trustee for Teri Fishbein Hecht, Beneficiary, and Robert C. Utley, on Behalf of Themselves and All Others Similarly Situated, Plaintiffs-Appellants,

v.

W. Bruce THOMAS, William R. Roesch, David M. Roderick, United States Steel Corporation, USS Inc., USS Holdings Company, USS Merger Sub, Inc., Goldman, Sachs & Co., Marathon Oil Company, Harold D. Hoopman, Charles H. Barre, Elmer H. Graham, W.E. Swales, Jack H. Herring, Victor G. Beghini, Neil A. Armstrong, James A.D. Geier, J.C. Haley, J.N. Land, Jr., Raymond C. Tower, Robert G. Wingerter, and the First Boston Corporation, Defendants-Appellees.

No. 83–3598.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 22, 1985.

Decided Sept. 13, 1985.

Jacob K. Stein [Lead Counsel], Paxton & Seasongood, Cincinnati, Ohio, Melvyn I. Weiss, argued, Milberg, Weiss, Bershad & Specthrie, New York City, Stanley R. Wolfe, Berger & Montague, P.C., Stewart Savett, Kohn, Savett, Marion & Graf, P.C., Philadelphia, Pa., for plaintiffs-appellants.

Murray Monroe, Cincinnati, Ohio, John L. Strauch [Marathon Oil], argued, Robert R. Weller, John M. Newman, Jr., Cleveland, Ohio, Richard S. Walinski, Toledo, Ohio, John W. Beatty, Cincinnati, Ohio, Richard J. Holwell [Lead Counsel], argued, Richard Reinthaler, New York City, William D. Ginn, Cleveland, Ohio, Henry T. Reath, Thomas Preston, Duane, Morris & Heckscher, Philadelphia, Pa., David C. Greer, Dayton, Ohio, Michael P. Graney, Simpson, Thacher & Bartlett, Columbus, Ohio, James T. Griffin, Michael P. Mullen, William J. Raleigh, Chicago, Ill., Ronald S. Rolfe, Cravath, Swaine & Moore, New York City, N.Y., for defendants-appellees.

Before MERRITT and KENNEDY, Circuit Judges; and PECK, Senior Circuit Judge.

MERRITT, Circuit Judge.

This class action suit arises out of the fall, 1981 contest for control of Marathon Oil Company which ended in a two-stage merger of Marathon into United States Steel (Steel), one of the largest mergers in United States history. The first stage involved a tender offer by Steel for 51 per cent of Marathon's outstanding shares at $125 per share. The second stage was a "freezeout merger"—a merger in which the majority buys out the minority shareholders—with Marathon merged into Steel as a wholly onwed subsidiary, and remaining Marathon shareholders receiving bonds worth approximately $76 per Marathon share. This suit is the consolidation of 13 separate actions challenging the two-step acquisition of Marathon by Steel as violative of the federal securities laws and state common law and fiduciary duty obligations. The three primary contentions underlying the various legal issues are that certain appraisals of Marathon's assets should have been disclosed to Marathon shareholders at the tender offer stage of the transaction, that the two-tier transaction with a second stage merger price lower than the front-end tender offer price was illegally coercive, and that Marathon's directors breached their fiduciary duty to the shareholders by structuring such a transaction in order to preserve their control over Marathon.

This action was heard before Judge Rubin in the Southern District of Ohio, and all issues were decided in favor of the defendants, some on summary judgment and others after trial before a jury. On appeal, the plaintiffs raise a large number of essentially legal challenges to the proceedings in the District Court, but for the reasons set forth at length below, we reject these challenges and affirm the District Court's decision in all respects.

## I.  FACTUAL BACKGROUND

In October, 1981, Marathon was a widely held, publicly traded Ohio corporation with over 58 million shares held by over 35,000 stockholders. Marathon was a vertically integrated oil and gas company, conducting exploration, production, transportation, refining and marketing and research. From 1976 to 1980, Marathon's net revenues and profits advanced at average annual rates exceeding 15%, but the first half of 1981 brought lower worldwide demand for oil and a strengthened dollar, events causing a sharp reversal in Marathon's performance. Earnings per share plunged to $2.64 from $4.08 a year earlier, and during the June, 1981 quarter, Marathon's four U.S. refineries operated at only 58% of capacity. A.

2588, Def.Ex. 424.10.[1]  The market price of a share of Marathon common stock, which had stood at $81 in November, 1980, fell to $45 in June, 1981.  A. 2686, Def. Ex. 695.

Although Marathon's stock price had fallen during early 1981, the company held substantial long term oil and gas reserves, including the Yates Field in West Texas, one of the largest and most productive oil fields ever discovered, and along with a number of other oil companies, Marathon became a prime potential takeover target in the summer of 1981.  In this threatening atmosphere, Marathon's top level management began preparations to defend against a hostile takeover bid.  Harold Hoopman, Marathon's president and chief executive officer, instructed the company's vice presidents to compile a catalog of Marathon's assets.  This document, referred to as the "Strong Report" or "internal asset evaluation," estimated the value of Marathon's transportation, refining and marketing assets, its other equipment and structures, and the value of proven, probable and potential oil reserves as well as exploratory acreage.  This report, discussed at greater length in *Starkman v. Marathon Oil Co.*, 772 F.2d 231, (6th Cir.1985), estimated the present value of oil and gas properties based on highly speculative assumptions regarding the level of prices and costs expected to prevail as far as thirty to fifty years into the future, and was described by Hoopman and John Strong, his assistant who was responsible for combining materials received from the various divisions into the final report, as a "selling document" which placed optimistic values on Marathon's oil and gas reserves so as to attract the interest of prospective buyers and ensure that Marathon could either ward off a hostile takeover attempt or at the very least obtain the best offer available and avoid being captured at a bargain price.

The Strong Report valued Marathon's net assets at between $19 billion and $16 billion, a per share value of between $323 and $276.  A similar report using identical methodology but based only on publicly available information (excluding, therefore, potential and unexplored acreage) was prepared in mid-July 1981 by the investment banking firm of First Boston, which had been hired by Marathon to assist in preparing for potential takeover bids.  The First Boston Report was similarly described as a "presentation piece" to avoid a takeover or to maximize the price obtained in a takeover, and it placed Marathon's net asset value at between $188 and $225 per share.

Marathon's market value was far below these appraised values, however, and on October 29, 1981, Marathon closed at $63.75 per share.  The next day, Mobil Oil Company announced its tender offer to purchase up to approximately 68% of outstanding Marathon common stock for $85 per share in cash.  Mobil proposed to follow the tender offer with a going-private or freezeout merger in which the remaining shareholders of Marathon would receive sinking fund debentures worth approximately $85 per share.

On October 31, 1981, Marathon's board of directors met in a day-long emergency session to consider Mobil's hostile tender offer.  At this time, there were twelve members of Marathon's board, equally split between inside and outside directors.  The inside directors were Hoopman and Marathon's five divisional vice presidents.  The outside directors were N.A. Armstrong, former astronaut; J.A.D. Geier, the chairman of Cincinnati Milacron; J. Haley, vice president of Chase Manhattan Bank; R.G. Weingerter, chairman of LOF; R.C. Tower, president of FMC; and J.N. Land, a former investment banker then engaged in financial consulting.  Haley was the only director absent from the October 30, 1981 meeting.

The meeting began with a presentation by inside and outside legal counsel explaining the possible adverse antitrust implications of the Mobil offer and reviewing the legal obligations of the board to act in the

---

**1.**  Throughout this opinion, "A" refers to the appendix on this appeal, "Def. (Pl.) Ex." refers to defendants' (plaintiffs') exhibit below, and "T" refers to the trial transcript.

best interests of Marathon's shareholders. Representatives of First Boston then delivered a lengthy presentation in which they compared the premium over market price offered by Mobil and stated their opinion that this premium was at best modest compared with other recent oil company takeovers. First Boston presented the results of its asset valuation report, but cautioned that the values did not represent realistic market values, as evidenced by the large number of companies whose market value was far less than their appraised value, and also that liquidation value would be significantly less than appraised value because of the relative bargaining positions in a liquidation, which in any event was felt to be an unrealistic response to Mobil's tender offer because of the length of time required to secure shareholder approval of a liquidation. First Boston urged the board to take quick action to find an alternative merger partner in the time remaining for shareholders to withdraw their tenders to Mobil, because even with potential antitrust problems, First Boston thought Mobil's offer still capable of succeeding.

After this presentation by First Boston, John Strong, Hoopman's assistant, spoke briefly and handed out the executive summary to the Strong Report. He described the document as a catalog that would be used in trying to sell the company to another bidder, and cautioned that there was very little correlation between the theoretical asset valuations and the market value of Marathon.

At the completion of these discussions, the outside directors met separately and unanimously determined to recommend that the board as a whole reject Mobil's offer, based on its potential illegality under the antitrust laws and the opinion of First Boston and the directors' own opinion that it was unfair to shareholders. The board as a whole then reconvened and unanimously agreed to recommend that shareholders reject Mobil's offer and authorized management to begin immediately the search for another potential bidder and also authorized counsel to file an antitrust suit

seeking to enjoin Mobil from proceeding further with its bid.

On November 1, 1981, Marathon filed its antitrust suit against Mobil, *Marathon Oil Co. v. Mobil Corp.*, 530 F.Supp. 315 (N.D. Ohio 1981), and secured a temporary restraining order prohibiting Mobil from purchasing any additional Marathon shares. Marathon's board and senior management meanwhile speedily contacted all of the thirty to forty companies who were considered reasonable merger candidates, while simultaneously advising shareholders by letter to reject Mobil's bid as "grossly inadequate." Both the Strong and First Boston reports were presented to potential merger partners in an attempt to kindle interest in Marathon.

Representatives of Steel and Marathon first met on November 10, 1981, at which time Hoopman gave Steel president David Roderick a copy of the asset valuation reports. On November 12, board member Elmer Graham, Marathon's vice president for finance, delivered financial information, including five-year earnings and cash flow projections to Steel in Pittsburgh. Negotiations between Hoopman and Roderick ended on November 17 in an offer by Steel to purchase up to 30 million shares (about 51%) of Marathon stock for $125 per share in cash, to be followed by a merger proposal in which each remaining Marathon shareholder would receive one $100 face value, 12 year, 12½% guaranteed note per share of common stock.

On November 18, a formal meeting of Marathon's board was held to consider Steel's offer in light of competing, but more tentative, proposals from Allied Corporation and Gulf Oil Corporation. Allied's proposal was considered to be highly questionable, because it was premised upon Marathon's purchase of an Allied subsidiary at a greatly inflated price in order to give Allied the cash to bid $101–105 per share for a minority interest in Marathon. Gulf proposed to purchase 50% of the outstanding Marathon shares for $130–140 per share and then consummate a merger in which Marathon shareholders would re-

ceive securities worth $100–110 per share, but Marathon's counsel advised that a merger with Gulf would pose antitrust problems equal to if not more severe than those raised in Marathon's own antitrust suit against Mobil. First Boston estimated that since current market interest rates were then in the 18 to 20% range, the second stage notes offered in Steel's proposal would sell for approximately $86 per share, yielding an average price, with the first stage tender offer at $125 per share, of $106 per share. First Boston then compared the 76.6% premium over market offered by Steel with other recent takeover premiums, showing that the premium offered by Steel greatly exceeded the average premium in recent control transactions. First Boston recommended that the board accept Steel's bid.

Steel's offer was communicated by Roderick over a conference telephone call to the entire Marathon board, and was offered on a take-it-or-leave-it basis, to remain open for one day. After Roderick's call, the board discussed Steel's offer, and outside director Land asked if there were any severance agreements or "golden parachutes" granted to Marathon's senior management in a side agreement. Hoopman answered that Steel had agreed only to cash out Marathon employee stock options held by the officers and upper level management at the expected average price offered by Steel to other Marathon shareholders of $106 per share, and that Steel had requested that the present Marathon board be kept intact. After this brief discussion, the directors were polled individually, and voted unanimously in favor of recommending that the shareholders accept Steel's offer.[2]

Steel mailed its tender offer on November 19, 1981, and simultaneously filed a Schedule 14D–1 with the SEC, as required by Rule 14d–3, 17 C.F.R. § 240.14d–3. Steel's tender offer specifically stated that the tender offer was the first step in "United States Steel's proposed acquisition of the entire equity interest" in Marathon, and described the terms of the second stage bond exchange. Def.Ex. 233, A. 2222, 2331–32. Hoopman sent a letter to Marathon's shareholders on November 19 in which he similarly described the two-tier transaction and recommended that shareholders accept Steel's tender offer. Def.Ex. 382, A. 2353. Marathon's Schedule 14D–9 attached to Hoopman's letter informed the shareholders of Gulf's proposal (describing Gulf anonymously as a "major oil company") and stated that this proposal had not been accepted because of anticipated antitrust problems. *Id.* Neither Steel's tender offer materials nor Hoopman's letter and attached Schedule 14D–9 revealed the existence of the Strong and First Boston reports and neither discussed Marathon's net appraised value, but Steel's tender offer did disclose that Steel had access to net income and cash flow projections for Marathon which were not publicly available, and those figures were set forth. Def.Ex. 233, A. 2228.

After Steel's tender offer was announced, the market price of Marathon stock rose, and fluctuated between $100 and $105 per share from November 19 until December 7. Def.Ex. 695, A. 2688–89.

---

**2.** The description of the October 31 and November 18 board meetings is drawn from Armstrong's testimony, T. 1811–1856, A. 758–800; Hoopman's testimony on cross, T. 830–36, A. 356–62; and the minutes of Marathon board meetings, Def.Ex.'s 218–220, A. 1941–69.

In the final agreement, Marathon also granted U.S. Steel an option to purchase up to 10,000 shares of Marathon common stock for $90 per share, and an option to purchase Marathon's interest in the Yates oil field for $2.8 billion if U.S. Steel's tender offer failed and another corporation succeeded in acquiring a majority interest in Marathon. On November 24, 1981,

Mobil sued Marathon, U.S. Steel and directors of Marathon, seeking to enjoin the U.S. Steel tender offer. On December 23, 1981, this court invalidated both the stock and Yates Field options as "manipulative devices" under 14(e) of the 1934 Exchange Act, 15 U.S.C. § 78n(e), and ordered that the U.S. Steel tender offer be kept open for a reasonable time. On remand, the District Court set a withdrawal deadline for the U.S. Steel offer of midnight, January 6, 1982 (the original withdrawal date stated in the offer was December 17, 1981). *Mobil Corp. v. Marathon Oil Co.,* 669 F.2d 366 (6th Cir.1981).

Mobil modified its offer in response to Steel's competing bid to provide for the purchase of 30 million shares at $126 per share, to be followed by a transaction in which the remaining shares would be exchanged for various securities to be valued at about $90 per share, and Mobil's offer remained open until enjoined on November 30 on the ground that it entailed probable antitrust violations. *Marathon Oil Co. v. Mobil Corp.*, 530 F.Supp. 315 (N.D.Ohio), *aff'd*, 669 F.2d 378 (6th Cir.1981), *cert. denied*, 455 U.S. 982, 102 S.Ct. 1490, 71 L.Ed.2d 691 (1982). After this court invalidated both the stock and Yates Field options originally promised to Steel as manipulative devices under Section 14(e) of the Williams Act in *Mobil Corp. v. Marathon Oil Co.*, 669 F.2d 366 (6th Cir.1981), the withdrawal date on Steel's tender offer was set at January 6, 1982. Between the original withdrawal deadline of December 7 and January 6, 1982, Marathon stock traded at between $88 and $82 per share. Def.Ex. 695, A. 2688–89. By this latter date, a total of over 53 million shares, or 91.18% of the total outstanding had been tendered to Steel, and Steel purchased the promised 30 million shares on a pro rata basis on January 7.

On February 8, 1982, a proxy statement was sent to the remaining Marathon shareholders announcing a March 11, 1982 shareholder meeting at which the merger with Steel would be consummated if approved by two-thirds of the Marathon stockholders, as required by Ohio law.[3] The proxy statement discussed the Strong and First Boston appraisals at some length, as is required in freezeout mergers by Rule 13e–3, 17 C.F.R. § 240–13e–3, warning, however, that the First Boston Report "should not be regarded as an independent evaluation or appraisal of Marathon's assets," and that the two reports were not "viewed

by Marathon's Board of Directors as being reflective of … per share values that could realistically be expected to be received by Marathon or its shareholders in a negotiated sale of the Company as a going concern or through liquidation of the Company's assets." Def.Ex. 756, A. 2707–08.

On March 11, 1982, the special shareholder meeting was held, and the shareholders approved the merger, with approximately 55% of the non-Steel Marathon shareholders voting for the merger, 20% voting against the merger, and 25% abstaining or not voting. A. 3525, Doc. 147. Marathon stock had traded at between $76 and $73 from the January 6 purchase date to the date of the shareholder meeting, indicating that the market eventually valued the bonds received in the merger at roughly $10 per share less than was forecast by First Boston.

## II. SUMMARY OF PROCEEDINGS BELOW

The present class action suit represents the consolidation of thirteen separate actions by former Marathon shareholders asserting claims against Marathon, Steel, their directors (as of November, 1981) and investment bankers. The plaintiff class consists of two subclasses: Marathon shareholders who owned stock on November 19, 1981 and did not tender to Steel; and those who did tender to Steel. The plaintiffs presented claims under the federal securities laws and alleged state common law fraud and breach of fiduciary duty. Of these various claims, there are five substantive issues involved in this appeal, and we briefly summarize the treatment of these issues below before discussing our disposition of each in more detail.

On February 2, 1983, Judge Rubin granted defendants' motion for summary judgment on all of the plaintiffs' federal securi-

---

**3.** Ohio Revised Code 1701.78(F) provides in pertinent part:

The vote required to adopt an agreement of merger or consolidation at a meeting of the shareholders of a constituent domestic corporation is the affirmative vote of the holders of shares of that corporation entitling them to

exercise at least two-thirds of the voting power of the corporation on such proposal or such different proportion as the articles may provide, but not less than a majority, and such affirmative vote of the holders of shares of any particular class as is required by the articles of that corporation.

ties law claims except the claim that the failure of the Marathon and Steel defendants to disclose the Strong and First Boston Reports in the tender offer materials violated Section 10(b) of the Securities and Exchange Act of 1934 (the Exchange Act), 15 U.S.C. § 78j(b), SEC Rule 10b–5, 17 C.F.R. § 240.10b–5, and Section 14(e) of the Williams Act, 15 U.S.C. § 78n(e).[4] Plaintiffs claimed that the failure to disclose these documents in the tender offer materials constituted the omission of material facts necessary to make the other statements made not misleading. In *Radol v. Thomas*, 556 F.Supp. 586, 593–94 (S.D.Ohio 1983), the District Court ruled that under the definition of materiality set forth in *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), the issue of whether the Strong and First Boston asset appraisals were material facts was a question "best left to a jury." In answer to questions 1 and 2 of the special interrogatory, the jury found unanimously that the omission of these reports from the tender offer materials distributed on November 19, 1981, did not violate the federal securities laws.  T. 2667, A. 1053.

The District Court entered summary judgment for the defendants on plaintiffs' claim that the tender offer materials constituted proxy solicitations because they represented the tender offer and second stage merger as a unitary transaction and violated Section 14(a) of the Exchange Act because they failed to comply with the proxy disclosure rules.[5]  Judge Rubin reaffirmed the view (as expressed in his decision denying plaintiffs' motion for a preliminary injunction) that "a tender offer and merger are distinct acts with separate consequences toward which the securities laws and SEC Rules are directed in their regulatory schemes," and that references to the second stage merger in the tender offer materials were made in compliance with SEC rules governing tender offers and "were not the equivalent of solicitations for the merger which would call forth application of the full panoply of the proxy rules." 556 F.Supp. at 591 (quoting *Radol v. Thomas*, 534 F.Supp. 1302, 1314 (S.D.Ohio 1982)).

**4.** Section 10(b) provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\*  \*  \*  \*  \*  \*

To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Section 14(e) provides, in pertinent part:

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation.

Rule 10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(1) to employ any device, scheme, or artifice to defraud,

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

**5.** Section 14(a) provides:

It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 781 of this title.

On the final federal securities claim at issue on this appeal, the District Court ruled that the two-tier merger of Marathon and Steel did not constitute market "manipulation" in violation of Section 10(b) of the Exchange Act or Section 14(e) of the Williams Act. 556 F.Supp. at 589–90. Judge Rubin observed that although the disparity between the front-end tender offer price offered by Steel and the back-end merger price did place pressure on Marathon shareholders to accept the tender offer, all tender offers are to some extent coercive, but the two-tier tender offer here did not "circumvent the natural forces of market demand" and did not discourage competing offerors and was therefore not "manipulative" under our interpretation of the term in *Mobil Corp. v. Marathon Oil Co.*, 669 F.2d 366 (6th Cir.1981).

The District Court refused to grant summary judgment for the defendants on plaintiffs' state law claim that Marathon's board violated their fiduciary duty to Marathon's shareholders by structuring a coercive two-stage transaction and consummating the merger at an unfair price, by failing to disclose the Strong and First Boston reports and other material information, and by cashing out their stock options at terms that were unavailable to other Marathon shareholders. A. 3316–18, 3321–22. The jury subsequently unanimously found that Marathon's directors had not breached their fiduciary duties to Marathon shareholders. A. 2667.

The District Court, however, entered summary judgment for Steel on plaintiffs' fiduciary duty claims, finding that Steel's involvement as a fiduciary was only as a majority shareholder of Marathon after the tender offer and only with respect to consummation of the second stage merger. Judge Rubin held that under Ohio law, a dissenting minority shareholder's sole remedy to redress his dissatisfaction with a freezeout merger is the statutory appraisal action provided by O.R.C. § 1701.85(A), provided that the merger is authorized by statute. A. 3318.

## III. DISCUSSION: FEDERAL SECURITIES ISSUES

### A. Duty to Disclose the Strong and First Boston Appraisals

Rule 13e–3(e), 17 C.F.R. § 240.13e–3(e), requires the disclosure of certain information set forth in Schedule 13E–3, 17 C.F.R. § 240.13e–100, in freezeout merger proxy statements. Item 9 of Schedule 13E–3 requires that a summary of any asset appraisal prepared in connection with such a merger must be furnished, and the summary must describe the methods, results and underlying assumptions of the appraisal. Steel complied with this rule by describing the Strong and First Boston reports in the second stage merger proxy statement. Plaintiffs contend, however, that such disclosure should also have been made in the tender offer materials distributed to shareholders by Marathon and Steel, and that the failure to disclose these reports violated Section 10(b) of the Exchange Act, Rule 10b–5, and Section 14(e) of the Williams Act because it constituted an omission of material facts necessary to make not misleading other affirmative statements made in the tender offer materials.

On appeal, plaintiffs particularly challenge the trial court's jury instructions on materiality and the duty to disclose these reports. The disputed instructions state:

An omitted fact is material if there is a substantial likelihood that a reasonable person would consider it important in deciding whether to tender his stock.

Only disclosure of existing material facts is required. Economic forecasts are not.

A failure to make known a projection of future earnings is not a violation of the Federal Securities law.

T. 2647–48, A. 1045–46.

■ In *Starkman v. Marathon Oil Co.*, 772 F.2d 231, (6th Cir.1985), we have reaffirmed our adherence to the basic rule established by our prior decisions that tender offer materials must disclose soft information, such as these asset appraisals based upon predictions regarding future

economic and corporate events, only if the predictions underlying the appraisal are substantially certain to hold. The Supreme Court's test for materiality as set forth in *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 450, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976), is whether there is a "substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." The District Court's instructions to the jury accurately stated this general test for materiality and the specific rule in this circuit governing the duty to disclose asset appraisals, and we have, in any event, held in *Starkman* that there was no duty to disclose the asset appraisals at issue here.

■ Indeed, if there was an error below on this issue, it was in allowing it to reach the jury. There is no other reported decision sending the materiality of an asset appraisal to the jury; every such decision involving an asset appraisal has held that there was no duty to disclose the appraisal.[6] Judge Rubin ruled that the Strong and First Boston reports were not immaterial as a matter of law because "[i]t is *conceivable* that a 'reasonable shareholder' would have accorded the valuations 'actual significance' in his deliberations, even if disclosure would not have altered his decision." *Radol v. Thomas*, 556 F.Supp. 586, 594 (S.D.Ohio 1983) (emphasis supplied). But the Supreme Court in *TSC Industries v. Northway*, 426 U.S. at 445–48, 96 S.Ct. at 2130–32, specifically reversed the court of appeals' definition in that case of material facts as all those which a reasonable shareholder *might* consider important, a definition which is essentially identical to Judge Rubin's ruling that the Strong and First Boston reports could be found to be material because a reasonable shareholder *conceivably* could consider them important.

The purpose of the more stringent "substantial likelihood" test for materiality is to lessen the uncertainty facing corporate officials in determining what must be disclosed while preserving shareholders' access to all truly factual information. Even with the correct instructions on materiality, sending the issue to the jury on the basis of an incorrect application of the test for materiality introduces great uncertainty regarding a particular jury's view of "substantial likelihood," and under our decisions, the District Court should have ruled that the reports were not material and removed the issue from the jury.

## B. Failure to Comply with the Proxy Rules

Plaintiffs claim that since the tender offer and the merger were viewed and represented by Steel and Marathon as a "unitary transaction," Marathon and Steel's tender offer materials constituted solicitations of shareholder consent to the proposed merger and should have contained all the information required to be included in a proxy statement under Section 14(a) of the Exchange Act. Relying on recent law review commentary,[7] plaintiffs argue that the two-tier tender offer put the typical Marathon shareholder in a position where he had to assume that if he tendered, he would virtually assure Steel's ability to consummate the merger, and that shareholders thus should have received all the information needed to evaluate the merger prior to the deadline tendering. The only judicial authority adduced in support of the plaintiffs' position is Judge Learned Hand's ruling in *SEC v. Okin*, 132 F.2d 784, 786 (2d Cir. 1943), that "writings which are part of a continuous plan ending in solicitation and which prepare the way for its success" are

---

6. See the discussion in *Starkman v. Marathon Oil Co.*, 772 F.2d 231, (6th Cir.1985), and the compilation of cases in *Flynn v. Bass Brothers Enterprises, Inc.*, 744 F.2d 978, 986, 988 (3d Cir.1984).

7. Plaintiffs rely on Brudney and Chirelstein, *Fair Shares in Corporate Mergers and Takeovers,*

88 Harv.L.Rev. 297, 330–40 (1974), and Brudney and Chirelstein, *A Restatement of Corporate Freezeouts,* 87 Yale L.J. 1354, 1361–62 (1978), where the authors argue that two-tier tender offers involving a second stage merger at a lower price than the front end tender offer are inherently coercive and should be prohibited.

subject to the SEC's power to regulate proxy solicitations.

■ In rejecting this claim on the defendants' summary judgment motion, Judge Rubin correctly ruled that "a tender offer and subsequent merger are distinct acts with separate concerns toward which the securities laws and SEC rules are directed in their regulatory schemes," and that it was "entirely appropriate to consider each step in such a transaction separately." *Radol v. Thomas*, 556 F.Supp. 586, 591 (S.D.Ohio 1983). Steel complied with Rule 14d–3, 17 C.F.R. § 240.14d–3, by filing a Schedule 14D–1 with the Commission which disclosed the basic terms of the proposed merger with Marathon, as required by Item 5(a) of 17 C.F.R. § 240.14d–100. As the target, Marathon complied with Rule 14e–2, 17 C.F.R. § 240.14e–2, by sending a letter to its shareholders recommending acceptance of Steel's offer and describing the two-stage plan, and Marathon also complied with Rule 14d–9, 17 C.F.R. § 240.-14d–9 by filing a Schedule 14D–9 with the Commission which described the basic terms of the merger. Both Steel and Marathon therefore complied with the specific disclosure requirements which apply to tender offers.

Requiring compliance with the proxy rules, in particular Rule 14a–9, 17 C.F.R. § 240.14a–9, or the specific freezeout merger proxy disclosure requirements in Rule 13e–3, 17 C.F.R. § 240.13e–3, in the tender offer stage of a two-tier transaction of this sort would be unfair because it would subject the tender offeror and target to the risk of liability for violating Section 5 of the Securities Act of 1933, 15 U.S.C. § 77e, by making an "offer to sell" securities prior to filing a registration statement for the securities.[8] In Securities Act Release No. 33–5927, *reprinted in* 3 Fed.Sec.L.Rep. (CCH) ¶ 24,284H (April 24, 1978), the Commission stated that the Section 5 "jumping the gun" prohibition would not apply to disclosure of a proposed second stage

merger in tender offer materials as required by Schedule 14D–1, because to rule that such disclosure constituted an offer to sell would not further the policies of the 1933 Act and would be inconsistent with the Williams Act policy of requiring such information in order to provide full disclosure to investors confronted with an investment decision in the context of a tender offer. However, the Commission also warned that disclosure at the tender offer stage should not go beyond that specifically required by the Williams Act and the tender offer rules, and that "statements which are not required by the Williams Act may constitute an 'offer to sell' the securities to be exchanged in the subsequent merger and, in the absence of a registration statement filed with the Commission at the commencement of the tender offer, may constitute a violation of Section 5 of the 1933 Act." 3 Fed.Sec.L.Rep. at 17,754. The plaintiffs' proposed extension of the comprehensive proxy statement disclosure requirements to the tender offer stage of a two-tier transaction thus risks placing the board in a completely untenable position in which liability attaches under the proxy rules for too little disclosure and under the 1933 Act for too much disclosure, a result we are unwilling to endorse. *Accord Sheinberg v. Fluor Corp.*, 514 F.Supp. 133, 137 (S.D.N.Y.1981); *American General Corp. v. NLT Corp.*, [1982 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,808, at 94,-142 (S.D.Texas July 1, 1982).

In addition, unlike *SEC v. Okin*, 132 F.2d at 786, where Judge Hand found that the Commission "would be powerless to protect shareholders" from misleading letters concerning an ongoing proxy solicitation sent in preparation for a soon-to-follow competing solicitation unless the letters were themselves held to be proxy solicitations, the Commission has set forth disclosure requirements for tender offers, and there are sound policy reasons for treating tender offers differently, with respect to

---

8. The securities involved here are the bonds to be exchanged for remaining Marathon shares in

the second stage merger.

the volume and content of required disclosure, than proxy statements.

Contrary to the plaintiffs' assumption, an individual shareholder does not assure the success of the second stage merger by choosing to tender in the first stage. Rather, the merger occurs only if the tender offer succeeds, and the success of the tender offer is determined by shareholders' collective valuation of the premium offered in relation to other competing offers (here, Mobil's outstanding tender offer). In the tender offer context, the market plays an important role in providing shareholders with information regarding the value of the target firm, and target management has an incentive to broker the best deal for shareholders and provide favorable, optimistic information to prospective bidders—precisely the kind of information the plaintiffs say was contained in the Strong and First Boston reports and precisely that which majority shareholders have an incentive to keep from the minority in an unfair freeze-out merger. The more extensive legal disclosure requirements which apply to freeze-out merger proxy statements are therefore justified by the fact that the law has given the majority the power to foreclose the ownership rights of the minority and has thereby eliminated the market as a correcting mechanism, leaving minority shareholders with only the option of dissent and appraisal, an option which cannot rationally be exercised unless the majority is compelled to make full disclosure regarding appraisals, earnings projections and other information that sheds light on the value of the firm. *Cf.* Toms, *Compensating Shareholders Frozen Out in Two-Step Mergers,* 78 Colum.L.Rev. 548, 554–60 (1978) (observing how the negotiating position of management in a unitary merger differs fundamentally from that of the corporation's individual shareholders in a tender offer).

For these reasons, neither Steel nor Marathon had a duty to comply with the proxy rules in their tender offer statements.

## C. The Two-Tier Tender Offer as Manipulation Under the Federal Securities Laws

In alleging that the two-tier, front-end-loaded acquisition of Marathon by Steel was a coercive and manipulative device, in violation of Section 14(e) of the Williams Act, Section 10(b) of the Exchange Act, and Rule 10b–5, plaintiffs have directly attacked the structure of this transaction as coercive, and have neither alleged below nor argued in this appeal that the two-tier transaction was not fully disclosed in Steel and Marathon's tender offer materials or that shareholders were in any manner deceived as to the nature of the transaction. In *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 477–79, 97 S.Ct. 1292, 1302–04, 51 L.Ed.2d 480 (1977), the Supreme Court held that allegations of deception or nondisclosure were essential to state a cause of action under Section 10(b). Based in large part on the interpretation of "manipulative" in *Santa Fe Industries,* and also on its reading of the legislative history of the Williams Act, the Court recently ruled in *Schreiber v. Burlington Northern, Inc.,* — U.S. ——, 105 S.Ct. 2458, 2465, 86 L.Ed.2d 1 (1985), that without misrepresentation or nondisclosure, Section 14(e) of the Williams Act has not been violated, thereby rejecting this court's previous analysis in *Mobil Corp. v. Marathon Oil Co.,* 669 F.2d 366 (1981). Since the plaintiffs have failed to allege nondisclosure or misrepresentation of the two-tier transaction, but have instead attacked its structure, they have failed to state a claim under either Section 10(b) (and Rule 10b–5) or Section 14(e) and we affirm the District Court's entry of summary judgment for the defendants on this issue.

## IV. STATE LAW ISSUES

### A. Breach of Fiduciary Duty by Marathon's Directors

Plaintiffs initially argue that the District Court erroneously granted summary judgment on their claim that in structuring the coercive two-tier acquisition—including the intentional establishment of an unfairly low

second stage price—Marathon's directors breached their fiduciary duty to the Marathon shareholders. The record, however, reveals otherwise. Judge Rubin specifically charged the jury that plaintiffs' claims included breach of fiduciary duty "by entering into an acquisition of Marathon by U.S. Steel on terms which were unfair to the shareholders of Marathon, and in particular to those shareholders who did not tender their shares to U.S. Steel." T. 2648, A. 1046. Moreover, the court's opinion denying the Marathon defendants' motion for summary judgment on the breach of fiduciary duty claim repeatedly characterizes that claim as revolving around "the Marathon directors' negotiation and approval of the structure and details of the two-step transaction ... a transaction which was, allegedly, inherently unfair." A. 3321–22.

Having allowed the issue to reach the jury, Judge Rubin gave the following charge on breach of fiduciary duty:

> I do instruct you that officers and directors of a corporation occupy a fiduciary relationship to the corporation and to its shareholders.
>
> A fiduciary must exercise the utmost good faith, and he must give undivided loyalty. He must be scrupulously honest.
>
> The exercise of the care, skill and diligence of a man of ordinary prudence dealing with his own property as a general rule fulfills the duty of a fiduciary.
>
> In dealing with shareholders, a corporate officer or director must disclose to them all material facts.
>
> A fiduciary, however, is not a guarantor or insurer. He is not liable for mistakes in judgment made in good faith.
>
> The fiduciary duty is not breached unless the directors committed fraud, or intentionally acted contrary to the best interest of the corporation and the shareholders.

T. 2649–50, A. 1047–48.

On appeal, plaintiffs argue that the District Court erred in instructing the jury that Marathon's directors violated their fiduciary duty to the shareholders only if they committed fraud or intentionally acted contrary to the best interest of the shareholders. Plaintiffs contend that the directors were not entitled to this instruction because they were under a conflict of interest due to Steel's assurance that the present board would be continued intact and Steel's agreement to cash out stock options held by upper-level management at the expected average price in the two-tier deal.

We must look to Ohio for the substantive law on this question, and in Ohio as in every other state, the long established principle is that directors of a corporation have an obligation to the corporation which is in the nature of that of a fiduciary. *Ohio Drill & Tool Co. v. Johnson*, 625 F.2d 738, 742 (6th Cir.1980); *Nienaber v. Katz*, 69 Ohio App. 153, 43 N.E.2d 322 (1942); 12 Ohio Jur.3d § 420, at 70–72 (1979). A director's obligation to the corporation includes two separate duties: the duty of loyalty and the duty of care. *See* ALI, Principles of Corporate Governance: Analysis and Recommendations, Introductory Note, Part IV, at 4 (Tent.Draft No. 4, April 12, 1985) (quoting *The Corporate Director's Guidebook*, 33 Bus.Law. 1591, 1599–1600 (1978) on the distinction between the duty of loyalty and the duty of care). The Ohio formulation of these duties was codified in 1984 in O.R.C. § 1701.59(B), and under the duty of loyalty, a "director shall perform his duties as a director ... in good faith, in a manner he reasonably believes to be in the best interests of the corporation," while under the duty of care, a director must perform his duties "with the care that an ordinary prudent person in a like position would use under similar circumstances."

Moreover, in evaluating a director's compliance with the duty of care, Ohio courts adhere to the "business judgment rule," and will not inquire into the wisdom of actions taken by the directors in the absence of fraud, bad faith or abuse of discretion. 12 Ohio Jur.3d § 415, at 63–64 (1979); *Ohio National Life Insurance Co. v. Struble*, 82 Ohio App. 480, 485, 81

N.E.2d 622, 625, *appeal dismissed,* 150 Ohio St. 409, 82 N.E.2d 856 (1948). See also O.R.C. § 1701.59(C), which states that "a person who, as a director of a corporation, performs his duties in accordance with division (B) of this section (discussed above) shall have no liability because he is or has been a director of the corporation." The business judgment rule recognizes that many important corporate decisions are made under conditions of uncertainty, and it prevents courts from imposing liability on the basis of ex post judicial hindsight and lowers the volume of costly litigation challenging directorial actions. *See generally* 3A W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 1039, at 37–38 (1975 ed.).

■ Plaintiffs contend, however, that the trial court's instructions were erroneous because they failed to state the proposition established by *Ohio Drill & Tool Co. v. Johnson,* 625 F.2d 738, 742 (6th Cir. 1980), and *Seagrave v. Mount,* 212 F.2d 389, 397 (6th Cir.1954), that good faith and full disclosure to shareholders do not insulate a director from liability if he has placed himself in a position of conflicting loyalties to the corporation and his own private interest. We find no conflict between these cases and the substance of the trial court's instructions. Both *Ohio Drill & Tool* and *Seagrave v. Mount* simply apply the rule that directors owe a duty of loyalty to the corporation and are not entitled to the discretion permitted by the business judgment rule when they are interested in a corporate control transaction which is the subject of their business judgment as directors. The trial court's instructions may not possess the clarity of a restatement, but in explicitly telling the jury that a fiduciary "must give his undivided loyalty" to the corporation and breaches his duty if he intentionally acts contrary to the best interests of the corporation, the court accurately stated the law in a manner consistent with *Ohio Drill & Tool* and *Seagrave v. Mount.*

■ In light of recent Supreme Court decisions severely restricting the substantive content of the federal securities laws as applied to tender offers and takeovers, and emphasizing the traditional role of state law in regulating the fairness of corporate control transactions, *see, e.g., Schreiber v. Burlington Northern,* —— U.S. ——, 105 S.Ct. 2458, 86 L.Ed.2d 1 (1985); *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), we have no wish to narrow the scope of state law fiduciary duties. Tender offers almost always present a potential conflict of interest for managers. But we cannot accept plaintiffs' underlying contention that in the context of corporate control transactions the burden of proof shifts to the directors to establish the fairness to shareholders of any transaction that would have the effect of retaining the directors' control. We reject the view that the stock option agreement and employment assurance alone placed the directors in a position of conflicting loyalties so that the burden of proof shifted to the defendants. Although there are no reported Ohio decisions addressing this contention, it has been rejected overwhelmingly in recent decisions from other jurisdictions involving an attack on the actions of corporate directors allegedly taken for the purpose of preserving corporate control in the face of a hostile tender offer, *Panter v. Marshall Field & Co.,* 646 F.2d 271, 295 (7th Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981); *Crouse-Hinds Co. v. InterNorth, Inc.,* 634 F.2d 690, 701–03 (2d Cir.1980); *Treadway Cos. v. Care Corp.,* 638 F.2d 357, 381 (2d Cir.1980), and the general rule remains that directors carry the burden of showing that a transaction is fair and in the best interests of shareholders only *after* the plaintiff has made a prima facie case showing that the directors have acted in bad faith or without requisite objectivity. *Norlin Corp. v. Rooney, Pace Inc.,* 744 F.2d 255, 264 (2d Cir.1984); ALI, Principles of Corporate Governance: Analysis and Recommendations, § 4.01 at 6, 11 (Tent.Draft No. 4, April 12, 1985) (protections of business judgment rule removed only if a challenging party can sustain his burden of showing the director was not

acting in good faith or with disinterest, or was not informed as to the subject of his business judgment).

It may be that some corporate control events, such as the payment of greenmail, should shift the burden of proof and invoke close judicial scrutiny, *see* Note, *Greenmail: Targeted Stock Repurchase and the Management-Entrenchment Hypothesis,* 98 Harv.L.Rev. 1045, 1056–59 (1985), but here the transaction merely provided that long term stock options—held by upper level management only and not by the outside directors—would be cashed out at the anticipated average price in the two-tier transaction, and that the officer-directors would be continued in their present positions, although their employment remained terminable at will. There were no severance payments or "golden parachutes" involved, and unlike *Norlin,* where the board of directors effectively assured itself voting control over the company in order to ward off hostile stock purchases by issuing new common and preferred to its wholly owned Panamanian subsidiary and to a newly created employee stock ownership plan, the ultimate decision on the proposed transaction with Steel was made by the shareholders in deciding to tender their shares and vote for the merger, thus preserving the fundamental principle of corporate governance that shareholders must control decisions affecting the corporation's survival as a legal entity.

### B. Marathon's Liability for Breach of Fiduciary Duty

The plaintiffs maintain that the District Court erred in instructing the jury that Marathon had no fiduciary duty to its shareholders and that plaintiffs' claim for breach of fiduciary duty was limited to its claim against Marathon's directors. Plaintiffs say that Marathon itself owed a fiduciary duty to its shareholders, because the fiduciary duty of an officer or director derives from his position as a representative of the corporation, or alternatively, that the fiduciary duty of an officer or director creates a fiduciary duty in the corporation.

Plaintiffs' argument is based on a fundamental misunderstanding of the nature of the corporate director's fiduciary relationship. A corporation is a legal entity created in derogation of the common law and the obligations of the corporation are defined by statute, as are the rights of shareholders. Under O.R.C. §§ 1701.59(A) and (B), except where the law, articles of incorporation or corporate regulations require action to be authorized by shareholders, all of the authority of a corporation is to be exercised under the direction of the corporation's directors, who must act in a manner they reasonably believe to be in the corporation's best interests. The directors stand, roughly, as trustees over the corporation, administering it for the benefit of the beneficial owners, the shareholders. *See* 3 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 848 (1975 ed.). Liability for breach of the directors' fiduciary obligation could not possibly run against the corporation itself, for this would create the absurdity of satisfying the shareholders' claims against the directors from the corporation, which is owned by the shareholders. There is not, and could not conceptually be any authority that a corporation as an entity has a fiduciary duty to its shareholders. *See Jordan v. Global Natural Resources, Inc.,* 564 F.Supp. 59, 68 (S.D.Ohio 1983).[9]

Similarly, although a corporation may be held vicariously liable to third parties for acts of directors and officers within their authority as representatives of the corporation, *see, e.g., Marbury Management, Inc. v. Kohn,* 629 F.2d 705 (2d Cir.), *cert. denied,* 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980), such vicarious liability has been sparingly imposed, primarily on brokerage firms in dealings with customers

---

**9.** The cases plaintiffs cite for the proposition that a corporation may have a fiduciary duty to shareholders all involve situations where the corporation owed a fiduciary duty to minority shareholders of a second corporation of which it was majority shareholder. *See, e.g., Southern Pacific Co. v. Bogert,* 250 U.S. 483, 491–92, 39 S.Ct. 533, 536–37, 63 L.Ed. 1099 (1919); *Zahn v. Transamerica Corp.,* 162 F.2d 36, 42 (3d Cir. 1947).

because of the special duty owed by brokers to customers. *Sharp v. Coopers & Lybrand,* 649 F.2d 175, 182 (3d Cir.1981). Plaintiffs have cited no case in which a corporation has been held vicariously liable to its shareholders for its directors' breach of fiduciary duty, and such a result would be flatly inconsistent with the rationale of vicarious liability, since it would shift the cost of the directors' breach from the directors to the corporation and hence to the shareholders, the class harmed by the breach.

### C. Joint and Several Liability of the Marathon Defendants, and Other State Law Claims

The plaintiffs assert that the jury verdict form on breach of fiduciary duty was erroneous because it did not permit the jury to find that some Marathon directors were liable while others were not and essentially instructed the jury that only joint and several liability could be found. Plaintiffs say this verdict form was particularly prejudicial because some of the directors, the officer-directors in particular, had greater knowledge and conflicts of interest than did others, and because of the inclusion of a prominent national hero, astronaut Neal Armstrong, an outside director, along with the other directors.

The Marathon board unanimously approved the merger with Steel, and unanimously agreed to oppose Mobil's offer, and the evidence was uncontroverted that these decisions were taken by the board as a whole. (*See* Hoopman testimony at T. 832–37, A. 358–63.) The law is clear that directors and officers of a corporation are jointly and severally liable if they jointly participate in a breach of fiduciary duty or approve, acquiesce in, or conceal a breach by a fellow officer or director. *Ohio Drill & Tool Co. v. Johnson,* 625 F.2d at 742; *Nienaber v. Katz,* 69 Ohio App. 153, 43 N.E.2d 322 (1942); 3 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 1002, at 546–47 (1975 ed.). Moreover, there is no authority in Ohio for the proposition that outside directors must be treated differently with respect to joint decisions by the entire board.

Plaintiffs also contend that Steel could have been found jointly liable at the tender offer stage for knowingly joining in a breach of fiduciary duty by Marathon's directors, but there is no authority for this exceptionally problematic notion, and the contention is in any event moot given that the jury, on the basis of correct instructions, found unanimously that Marathon's directors had not breached their fiduciary duty. Plaintiffs' attack on the trial court's failure to allow emendation of the complaint to include a claim that statements regarding the nature of the Strong and First Boston reports in the proxy materials were false and misleading is equally without merit. Similarly without merit is the plaintiffs' contention that the court's decision to admit the testimony of class member Fishbein was reversible error, and we find all other miscellaneous points of error raised by the plaintiffs to be groundless.

Accordingly, the judgment of the District Court is affirmed.