**In re AMCAST INDUSTRIAL CORPORATION, et al.,
Debtors–in–Possession.**

**Liquidating Trustee of the Amcast Unsecured Creditor Liquidating Trust, Plaintiff,**

**v.**

**James K. Baker, et al., Defendants.**

**Bankruptcy No. 04–40504.
Adversary No. 05–3515.**

United States Bankruptcy Court,
S.D. Ohio,
Western Division at Dayton.

March 12, 2007.

Ronald E. Gold, Cincinnati, OH, for Plaintiff.

Gerald V. Weigel, Jr., Jan H. Steinher, James E. Burke, Jason V. Stitt, Robert G. Sanker, Keating Muething & Klekamp PLL, Cincinnati, OH, Ronald S. Pretekin, Coolidge Wall Co. LPA, Dayton, OH, for Defendants.

## DECISION OF THE COURT GRANTING, IN PART, AND DENYING, IN PART, DEFENDANTS' MOTIONS TO DISMISS

LAWRENCE S. WALTER, Bankruptcy Judge.

The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334, and the standing General Order of Reference in this District. This matter is before the court on the motion to dismiss filed by all defendants to this adversary proceeding except Leo W. Ladehoff and the separate motion to dismiss filed by Defendant Leo W. Ladehoff [Adv. Docs. 21 and 22]. Plaintiff Mark Stickel, Liquidating Trustee of the Amcast Unsecured Creditor Liquidating Trust, filed a memorandum in response to the motions to dis-

miss [Adv. Doc. 28] and the Defendants filed replies [Adv. Docs. 34 and 35].

### PROCEDURAL AND FACTUAL BACKGROUND

On December 28, 2005, Mark Stickel, the Liquidating Trustee of the Amcast Unsecured Creditor Liquidating Trust ("Liquidating Trustee"), initiated an adversary proceeding against the Defendants, all of whom were identified in the Complaint as former officers and directors of Amcast Industrial Corporation ("Amcast") who served at different points during the years 2000 to 2005 (collectively "Defendants"). [Adv. Doc. 1, "Complaint," ¶¶ 12 –29.] In general, the Liquidating Trustee asserts tort claims against the Defendants including breach of fiduciary duty, conversion, waste of corporate assets and deepening insolvency, among others. The claims relate to modifications approved by the Defendants to the structure and payment of retirement benefits to executives and, most significantly, to former Chief Executive Officer and Director, Leo W. Ladehoff, a named Defendant ("Ladehoff").

The following facts are as alleged in the Liquidating Trustee's Complaint and the documents attached thereto. The facts are assumed as true for purposes of the Defendants' motions to dismiss, but do not constitute the findings of the court.[1]

#### A. Creation of the Liquidating Trust/Designation of Liquidating Trustee

On November 30, 2004, Amcast together with certain subsidiaries filed voluntary petitions for bankruptcy protection. [Complaint, ¶ 1.] On July 29, 2005, this court confirmed the Reorganized Debtors' Third Amended Joint Plan of Reorganization ("Plan"). [Complaint, ¶¶ 2 and 3.]

The Plan established a liquidating trust for purposes of receiving, liquidating and distributing the Creditor Trust Assets assigned to holders of general unsecured claims under the Plan ("Creditor Trust"). [Complaint, ¶ 10.] The Reorganized Debtors transferred the Creditor Trust Assets to the Creditor Trust on the Effective Date of the Plan and the assets were automatically and irrevocably vested in the Creditor Trust. [*Id.*]

The Creditor Trust Assets include "Creditor Trust Causes of Action" which are defined in the Plan as:

> any and all claims and causes of action held by the Reorganized Debtors or the Estates (or claims of generalized harm to creditors as opposed to direct claims of individual creditors) related to any and all pre-petition rabbi trusts, pension plans (qualified and unqualified), supplemental executive plans, or similar claims with respect to the Reorganized Debtors' pension or retirement plans.

[*Id.*] The Plan grants authority to the Liquidating Trustee to take any action necessary to administer the liquidating trust. [*Id.*] Pursuant to the terms of the Plan, the Creditors Committee designated Mark Stickel of Bridge Associates L.L.C. as the Liquidating Trustee. [Complaint, ¶ 11.]

#### B. Liquidating Trust's Claims Against Defendants

The Liquidating Trustee alleges that the Defendants were officers and/or directors

---

1. In some instances, the facts recited in the Complaint are ambiguous, even when supplemented by the attached documents and subsequently filed memoranda of the parties. This is especially true with respect to the details of Ladehoff's retirement package and the enhancements to that package that are central to the Liquidating Trustee's causes of action. Where such ambiguity exists, the court has directly quoted from the Complaint rather than attempting to interpret and clarify the language without the benefit of evidence or testimony.

of Amcast at different points during the years 2000 through 2005. [Complaint, ¶¶ 12–29.] The Liquidating Trustee's claims against these Defendants arise from events beginning in 1995 related to the structuring and payment of executive retirement benefits and, more specifically, those of Ladehoff. [Complaint, ¶¶ 21 and 30–31.] Ladehoff was Chief Executive Officer and Chairman of the Board of Directors of Amcast during relevant periods between 1995 and 2000 and a Director of Amcast during relevant periods between 2001 and 2003. [Id.]

## 1. Ladehoff's Retirement and the Terms of His Executive Agreement

Prior to his retirement as Chief Executive Officer, Ladehoff entered into an employment/termination agreement dated March 3, 1995. [Complaint, ¶¶ 30 and 31.] The agreement was amended and restated as an Executive Agreement effective August 1, 1997 ("Executive Agreement"). [Complaint, ¶ 30.] A copy of the Executive Agreement is attached to the Liquidating Trustee's Complaint as Exhibit A.

Section 6 of the Executive Agreement provided for payment of $7,000 per month ($84,000 per year) to Ladehoff for ten years following his retirement from Amcast as CEO. [Complaint, ¶ 31; Ex. A, Section 6(a).]

Section 6 further provided that Ladehoff would receive other benefits from Amcast in the form of enhancements to his already existing benefits from his participation in Amcast's Merged Pension Plan, a plan qualified under Section 401 of the Internal Revenue Code ("Pension Plan"). Addi-

tionally, he would receive enhancements to his already existing benefits from his participation in the Amcast Industrial Corporation Non–Qualified Supplementary Benefit Plan, also called the SERP, which was not qualified under Section 401 ("SERP"). [Complaint, ¶¶ 32 and 33; Ex. A, Section 6(b).] A copy of Amcast's Merged Pension Plan, as Restated Effective September 1, 1997 and as Further Amended Through December 31, 2001 is provided as Exhibit B to the Liquidating Trustee's Complaint and a copy of the SERP (July 1, 1999 and June 1, 2000 Restatements) is attached to the Liquidating Trustee's Complaint as Exhibit C.

The enhancements in the Executive Agreement were to be an annual amount equal to the difference between the yearly payments Ladehoff received from the Pension Plan and SERP and $210,000 per year so that Ladehoff's total payments would equal $210,000 annually.[2] [Id.] "[T]he $210,000 annual additional retirement benefit paid to Ladehoff was comprised of ... approximately $49,524 to be paid from the Pension Plan ... and ... approximately $160,476 ... from funds from a nonqualified plan of Amcast." [Complaint, ¶ 32.] The "nonqualified plan ... was subject to the claims of creditors of Amcast and the Reorganized Debtors."[3] [Id.]

Sections 10 and 11 of the Executive Agreement set up a method by which Ladehoff could receive accelerated payments of the amounts due under Section 6 and the SERP. [Complaint, ¶ 33 and Ex. A, Sections 10 and 11.] These sections required Amcast to establish a Rabbi Trust and, upon Ladehoff's election, Amcast was to fund the Rabbi Trust in the amount of

2. The enhancements also included amounts payable to Ladehoff's surviving spouse upon his death so that she would receive a total of $105,000 per year from the Pension Plan and SERP. [Complaint, ¶ 32; Ex. A, Section 6(b).]

3. It is unclear from the Complaint whether the referenced nonqualified plan is the SERP.

the Net Present Value (as defined in Section 12 of the Executive Agreement). [Complaint, ¶¶ 35 and 36, and Ex. A, Sections 10, 11(a) and 11(b).]

Once funded, Section 11 provided for different scenarios that would allow Ladehoff to receive all or a portion of the Net Present Value of his benefits out of the Rabbi Trust. First, at any time between September of 1995 and September of 2005, Ladehoff could elect to receive an amount equal to the Net Present Value, as determined on the date this option would be exercised, less 12 percent of that amount. [Ex. A., Section 11(b).] Second, Section 11(c) of the Executive Agreement provides that if Amcast's debt to equity ratio exceeded 2 to 1, as derived from Amcast's quarterly report to its shareholders, then Amcast was to pay the Net Present Value with the determination date being the last day of the fiscal quarter on which this condition first existed. [Complaint, ¶ 34 and Ex. A, Section 11(c).]

## 2. The Rabbi Trust and Trust Agreement

Pursuant to the terms of Section 10 of the Executive Agreement, Amcast funded the Rabbi Trust in or about August of 2000 with an annuity purchased from Travelers Insurance Company. [Complaint, ¶ 36.] The Liquidating Trustee believes that the premium paid by Amcast to purchase the annuity was $1,535,482.50. [Id.]

The Rabbi Trust was governed by the Trust Agreement for the Amcast Industrial Corporation Non–Qualified Supplementary Benefit Plan and Executive Agreement with Leo W. Ladehoff ("Trust Agreement"). A copy of the Trust Agreement is attached to the Liquidating Trustee's complaint as Exhibit D. [Complaint, ¶¶ 35 and 36.] Important Sections of the Trust Agreement for purposes of this matter include the following:

1) Section 5.1 of the Trust Agreement provided for a Trustee to accept all cash contributions, contracts and other property delivered to the Trustee by Amcast. [Complaint, ¶ 37 and Ex. D, Section 5. 1.] All contributions received by the Trustee were to constitute the trust fund. [Id.]

2) Section 5.6 of the Trust Agreement adds that "[e]xcept as provided in Article VI and Section 13.1, [Amcast] shall have no right or power to direct Trustee to return to [Amcast] or divert to others any of the Trust assets before all payment of benefits have been made to [SERP] participants and their beneficiaries pursuant to the terms of the Plan(s)." [Complaint, ¶ 38 and Ex. D, Section 5.6.]

3) Sections 6.1 and 6.2 of the Trust Agreement provide that (i) the Rabbi Trust is a grantor Trust; (ii) all benefits of the Rabbi Trust are subject to the claims of creditors of Amcast; (iii) if Amcast is insolvent, the Trustee of the Rabbi Trust shall cease payments of benefits to participants; and (iv) Amcast shall be considered insolvent for purposes of the Rabbi Trust if Amcast is unable to pay its debts as they become due or files for bankruptcy protection. [Complaint, ¶ 39 and Ex. D, Sections 6.1–6.2.]

4) Section 6.3 of the Trust Agreement provides that "[a]t all times during the continuance of this Trust, the principal and income of the Trust shall be subject to claims of general creditors of the Company under federal and state law. . . ." [Complaint, ¶ 40 and Ex. D, Section 6.3.] This section further placed responsibility upon the Board of Directors and the Chief Executive Officer of Amcast to inform the Trustee of the Rabbi

**100**

Trust in writing if Amcast should become insolvent. [*Id.*]

5) Section 13.1 of the Trust Agreement provides that the "Trust shall be terminated upon the earliest of any of the following events: (i) the exhaustion of the Trust Fund; or (ii) the final payment of all amounts payable to all of the Participants pursuant to all of the Plan." [Complaint, ¶ 41 and Ex. D, Section 13. 1.] Upon termination of this Trust, any remaining portion of the Trust Fund was to be paid to Amcast. [*Id.*]

### 3. Restructuring of Ladehoff's Benefits

In 2000, Ladehoff and other Defendants exchanged correspondence acknowledging that the Rabbi Trust would be available for the benefit of creditors of Amcast if Amcast should become insolvent. [Complaint, ¶ 42.] In the same year, Ladehoff acknowledged his concerns about the current financial condition of Amcast and that Amcast was contemplating various strategic alternatives as it related to Ladehoff's benefits. [*Id.*]

In or about April of 2001, Defendants decided that Ladehoff's severance and retirement benefit plan should be restructured and Ladehoff's schedule of payments should be revised. [Complaint, ¶ 43.] The Liquidating Trustee takes issue with several of the changes that were made to the benefit structure.

### a. Exchange of annuity and return of excess funds to Amcast

The Liquidating Trustee asserts that the Defendants directed Travelers to surrender the annuity held by the Rabbi Trust and exchange it for a new annuity that resulted in a premium refund paid back to Amcast. This was accomplished after one or more of the Defendants "improperly authorized, permitted and/or acquiesced to

informing the Trustee of the Rabbi Trust that 'both the company [Amcast] and Mr. Ladehoff to exchange the annuity for one that more closely matched to this payment schedule. . . . The excess should be paid as direct (sic) by the company.'" [Complaint, ¶ 44.]

At the Defendants' direction, Travelers surrendered the annuity held by the Rabbi Trust and applied $803,750.29 of the premium refund to the purchase of a 50% Longer Life Annuity with a Cash Refund feature and a monthly benefit in the amount of $6,242.33 for Ladehoff effective July 1, 2001. [Complaint, ¶ 45.] After deducting the new annuity premium, Travelers returned the excess premium refund in the amount of $576,363.11 to Amcast. [*Id.*]

### b. Shifting of nonqualified retirement benefits from the SERP into the Pension Plan

Next, the Liquidating Trustee asserts that nonqualified retirement benefits from the SERP were shifted into the Pension Plan. According to the Liquidating Trustee, in 2001 the Defendants improperly authorized, permitted and/or acquiesced to the amendment of the Pension Plan to increase the pension benefit payable under the Pension Plan for the officers of Amcast ("2001 Pension Plan Amendment"). [Complaint, ¶ 46.] Ladehoff was acting Chairman of the Board of Directors of Amcast at the time of the 2001 Pension Plan Amendment and the Liquidating Trustee believes that Ladehoff stood to nearly triple his Pension Plan benefit as a result. [Complaint, ¶ 47.]

The purpose of the 2001 Pension Plan Amendment, according to the Complaint, was to pay obligations under the Pension Plan that would have accrued and been payable under the SERP and were already the sole obligations of Amcast. [Com-

plaint, ¶ 48.] The Liquidating Trustee believes that at the time of the 2001 Pension Plan Amendment, the Pension Plan was underfunded and became significantly underfunded thereafter. [Complaint, ¶ 49.]

As a result of the 2001 Pension Plan Amendment, the Liquidating Trustee alleges that the value of the benefits to be paid to retired executives of Amcast increased by providing more of the benefits under the Pension Plan subject to the protections of the Employee Retirement Income Security Act of 1974 ("ERISA") from creditors of both Amcast and the participants, as well as the opportunity to defer taxation on such amounts to a later date upon distribution by rolling over the amounts into another qualified retirement plan or into an individual retirement account. [Complaint, ¶ 50.]

In implementing the 2001 Pension Plan Amendment, Amcast spent in excess of $200,000 in commissions and administrative fees to restructure the Pension Plan and the SERP. [Complaint, ¶ 51.]

Through these actions, the Complaint asserts, the Defendants improperly transferred obligations to the Pension Plan which Defendants knew or should have known would have remained Amcast's obligations. [Complaint, ¶ 52.]

**c. Acceleration of benefit payments to Ladehoff and transfer of ownership of the annuity contract to him in the Rabbi Trust**

According to the Complaint, in 2003, the Defendants then improperly authorized, permitted and/or acquiesced to the acceleration of payments to Ladehoff in two installments. [Complaint, ¶ 53.] The first installment, totaling $212,132, was paid to Ladehoff in January of 2003. [Complaint, ¶ 54.] It was calculated to be the present value of the remaining payments of $7,000 per month pursuant to Section 6.1 of the Executive Agreement. [Id.] The transfer

by Amcast to Ladehoff was from property of Amcast that was subject to the claims of creditors. [Id.]

The second installment involved the transfer of the annuity held by the Rabbi Trust. [Complaint, ¶ 55.] Ladehoff requested a payment from Amcast of the remaining net present value of monies due under the SERP. [Id.] Ladehoff requested that the annuity be transferred to an IRA in his name to defer immediate taxation. [Id.] Because the annuity could not be rolled over into an individual retirement account, the annuity was transferred by Amcast to Ladehoff. [Id.]

On or about September 17, 2003, Defendant Jeffrey McWilliams, with the assistance, approval and/or acquiescence of the other Defendants, requested that the Trustee of the Rabbi Trust "agree that the Owner of the annuity payable by Travelers Insurance Company with Leo Ladehoff as Annuitant is to be changed to reflect Ladehoff as Owner." [Complaint, ¶ 56.] This September 2003 transfer by Amcast to Ladehoff was from property of Amcast that was subject to the claims of creditors of Amcast. [Id.] The value of the annuity transferred was stated to be $745,269.66 as of September 17, 2003. [Complaint, ¶ 57.]

At the time Ladehoff received the two transfers described, Amcast was insolvent and/or in the zone of insolvency. [Complaint, ¶ 59.] Defendants never informed the Trustee of the Rabbi Trust that Amcast had become insolvent despite the requirements of the Rabbi Trust. [Complaint, ¶ 61.]

## LEGAL ANALYSIS

**A. Legal Standard for Determining Motions to Dismiss**

The Defendants request dismissal of the Liquidating Trustee's Complaint under

Fed.R.Civ.P. 12(b)(6), incorporated in bankruptcy adversary proceedings by Fed. R. Bankr.P. 7012. They argue that the Liquidating Trustee has failed to state any claim upon which relief can be granted.

The court's responsibility on a motion to dismiss is to assess the sufficiency of the claims asserted in the complaint and not to weigh the evidence. *Perry v. United Parcel Service*, 90 Fed.Appx. 860, 860–61 (6th Cir.2004) (noting that the complaint may be dismissed only if the plaintiff has failed to allege facts that, if true, would entitle him to relief). Thus, in considering a motion to dismiss pursuant to Rule 12(b)(6), the court "must consider as true the well-pleaded allegations of the complaint and construe them in the light most favorable to the plaintiff." *Varljen v. Cleveland Gear Co., Inc.*, 250 F.3d 426, 429 (6th Cir.2001). However, the court "need not accept as true legal conclusions or unwarranted factual inferences" in a complaint. *Id.*

To survive a motion to dismiss, a plaintiff's complaint "must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Id.* (noting that for a dismissal to be proper, "it must appear beyond doubt that the plaintiff would not be able to recover under any set of facts that could be presented consistent with the allegations of the complaint"). *See also In re Cadillac by DeLorean*, 262 B.R. 711, 714 n. 3 (Bankr. N.D.Ohio 2001). While the material elements must be asserted, the Federal Rules of Civil Procedure do not require a plaintiff to set out in detail the facts in support of each cause of action. *Limor v. Buerger (In re Del–Met Corp.)*, 322 B.R. 781, 793 (Bankr.M.D.Tenn.2005). Rather, the Rules require a short and plain statement of the claim that will give defendants fair notice of what the plaintiff's claim is and upon what grounds it rests. *Id.*

In their motions to dismiss, the Defendants in this case argue that the Liquidating Trustee failed to state sustainable claims against them for various reasons including that the Liquidating Trustee's claims are factually deficient, that certain claims are not recognized under Ohio law, and that the claims are barred by a defense raised by the Defendants. The court will address each claim and the defense of *in pari delicto* separately.

### B. Count One: Breaches of Fiduciary Duties

The Liquidating Trustee's Complaint asserts breach of fiduciary duty claims against all of the Defendants. Specifically, the Liquidating Trustee states that the Defendants, as officers and directors of Amcast, owed fiduciary duties to Amcast and, in addition, that those fiduciary duties extended to creditors while Amcast was insolvent and/or in the "zone of insolvency." According to the Complaint, they breached their duties to Amcast and its creditors by failing to adhere to the terms of the Pension Plan, SERP, and Rabbi Trust and by failing to maximize Amcast's value "for the benefit of creditors and the Reorganized Debtors." Therefore, the Liquidating Trustee concludes, the Defendants should be liable for resulting damages.

The Defendants request dismissal for various reasons including that the Defendants owe no duty to Amcast's creditors, that Amcast was not harmed by any of the alleged wrongdoing, and that documentary evidence submitted with their motions to dismiss confirms that Amcast was not insolvent at the time of the restructuring of benefits. Before turning to the specifics of the Defendants' arguments, the court will address the fiduciary obligations directors

and officers owe to a corporation and whether those obligations extend to others, such as creditors, when a corporation is financially troubled.

## 1. Fiduciary Obligations of Directors and Officers Generally

In Ohio, it is a well established principle that directors and officers have a fiduciary relationship and position of trust with respect to the corporation they serve. *Radol v. Thomas,* 772 F.2d 244, 256 (6th Cir.1985); *Wing Leasing, Inc. v. M & B Aviation, Inc.,* 44 Ohio App.3d 178, 542 N.E.2d 671, 676 (1988). The nature of a director's fiduciary duty and standard of care has been codified at Ohio Rev.Code §§ 1701.59 and 1701.60. *Radol,* 772 F.2d at 256; *Koos v. Central Ohio Cellular, Inc.,* 94 Ohio App.3d 579, 641 N.E.2d 265, 272 (1994). Although the fiduciary obligations of officers of a corporation have not been so codified, Ohio courts impose a similar common law duty on officers.[4] *Koos,* 641 N.E.2d at 272 (noting that officers as well as directors are in a fiduciary position of trust as to all corporate matters). Because officers, like directors, have a fiduciary duty to the corporation and are held to a similar standard in Ohio, the court will focus the remainder of its analysis on a director's standard of care.

Ohio Rev.Code § 1701.59 requires a director to perform his duties "in good faith, in a manner the director reasonably believes to be in or not opposed to the best interests of the corporation, and with the care that an ordinarily prudent person in a like position would use under similar circumstances." Ohio Rev.Code § 1701.59(B). A director who performs his duties in accordance with this standard shall have no liability imposed because of his position as director of the corporation. Ohio Rev.Code § 1701.59(C); *Radol,* 772 F.2d at 257. This limitation on a director's liability is essentially a codification of the "business judgment rule," a common law rule pursuant to which courts defer to the business judgment of directors who are making corporate decisions within their broad discretion. *State Farm Mutual Auto. Insurance Co. v. Superior Court,* 121 Cal.App.4th 490, 17 Cal.Rptr.3d 146, 149 n. 2 (2004); 3A *Fletcher Cyclopedia of the Law of Private Corporations* § 1036. The rule recognizes that "many important corporate decisions are made under conditions of uncertainty" and, consequently, courts are not to "inquire into the wisdom of actions taken by the directors in the absence of fraud, bad faith or abuse of discretion."[5] *Radol,* 772 F.2d at 256–57.

---

4. A corporate officer has only such authority and duties as determined by the board of directors. Ohio Rev.Code § 1701.64. While officers are held to a similar standard of care towards a corporation, they will not be held personally liable for acts of a corporation merely by virtue of their status as officers. *State ex rel. Fisher v. American Courts, Inc.,* 96 Ohio App.3d 297, 644 N.E.2d 1112, 1114 (1994). An officer must participate in the corporate actions to be liable or the circumstances must involve self-dealing. *Id. See also Steinberg v. Kendig (In re Ben Franklin Retail Stores, Inc.),* 2000 WL 28266, at *6 (N.D.Ill. Jan.12, 2000).

5. In order to prove that a director has breached his duties, it must be demonstrated, by "clear and convincing evidence that the director has not acted in good faith, in a manner that the director reasonably believes to be in or not opposed to the best interests of the corporation...." Ohio Rev.Code § 1701.59(C). Furthermore, for that director to be liable for damages in any action that he takes or fails to take, it must be proven by "clear and convincing evidence ... that the director's action or failure to act involved an act or omission undertaken with deliberate intent to cause injury to the corporation or undertaken with reckless disregard for the best interests of the corporation." Ohio Rev. Code § 1701.59(D).

■ However, the business judgment rule does not apply when directors derive personal financial benefit from their decisions and are, therefore, not disinterested. *Id.* at 257; *Koos,* 641 N.E.2d at 272–73. While such decisions are not necessarily void, they are closely scrutinized. *Koos,* 641 N.E.2d at 273. In such circumstances, the director will be required to show that the transaction was fair and reasonable to the corporation notwithstanding his or her personal interest. Ohio Rev.Code § 1701.60; *Koos,* 641 N.E.2d at 273.

■ Critical to this case is the guidance provided by the Ohio Revised Code with respect to the interests a director is to take into consideration when making important corporate decisions. In deciding what is in the best interests of the corporation, the Ohio Revised Code mandates that the director consider the "interests of the corporation's shareholders." Ohio Rev.Code § 1701.59(E). The Code further provides that, "in the director's discretion, [a director] *may* consider the following:

(1) The interests of the corporation's employees, suppliers, *creditors,* and customers;

(2) The economy of the state and nation;

(3) Community and societal considerations;

(4) The long-term as well as short-term interests of the corporation and its shareholders, including the possibility that these interests may be best served by the continued independence of the corporation.

Ohio Rev.Code § 1701.59(E) (emphasis added). This section codifies the general rule that corporate directors owe their fiduciary obligation directly to the corporation and its shareholders, not to any creditors of the corporation. 3A *Fletcher Cyclopedia of the Law of Private Corporations* § 1035.60. *See also Production Resources Group, LLC v. NCT Group, Inc.,* 863 A.2d 772, 787 (Del.Ch.2004) (emphasizing that creditors are protected not through a fiduciary relationship with directors, but through their contracts and state fraudulent conveyance laws).

Important to the Liquidating Trustee's theory, however, is that according to caselaw in most jurisdictions, directors of a corporation owe a fiduciary duty to the corporation's creditors, and not just the corporate shareholders, upon the corporation becoming insolvent (or upon entering an ill-defined "zone of insolvency" in some jurisdictions).[6] 3A *Fletcher Cyclopedia of*

---

**6.** A seminal case relied on for the expanded duty of directors to creditors when a corporation is threatened with insolvency is *Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp.,* 1991 WL 277613 (Del.Ch. Dec.30, 1991). *See* Dennis J. Connolly and Bess M. Parrish, *Current Issues Involving the Application of Exculpation and the Business Judgment Rule to Creditors' Suits Against Directors of Insolvent Corporations,* Norton Annual Survey of Bankruptcy Law 1, 9 (2006). Interestingly, this case did not involve creditors suing directors for a breach of fiduciary duty. Instead, in *Credit Lyonnais,* the directors used the expanded duty as a "shield" against a lawsuit initiated by a majority stockholder angered by the board's refusal to authorize a course of action he advocated because the board considered it too risky. 1991

WL 277613, at *33–34. In determining that the board did not breach its fiduciary obligations, the Delaware Court of Chancery held that, in the "vicinity of insolvency," the board's fiduciary duty of loyalty was not only to this shareholder but also to the corporate enterprise. *Id.* at *34. The court found that under Delaware law, the directors of an insolvent corporation have an "obligation to the community of interest that sustained the corporation, to … maximize the corporation's long-term wealth creating capacity." *Id.*

Although the expanded duty discussed in *Credit Lyonnais* was originally created to "shield" directors from stockholders demanding extreme risk when the company is threatened with insolvency, some courts have extended the doctrine allowing it to be used as a

*the Law of Private Corporations* § 1035.60. The Liquidating Trustee and Defendants dispute whether the language in Ohio Rev.Code § 1701.59(E) precludes such a mandatory fiduciary duty to creditors arising under Ohio law upon a corporation's insolvency.

The Defendants argue that no fiduciary duty to creditors arises because the language of Ohio Rev.Code § 1701.59(E) permits, but does not require, directors to consider the interests of creditors in making corporate decisions even when a corporation is insolvent or in the zone of insolvency. The Defendants' argument finds support in the unreported decision of *Official Committee of Unsecured Creditors of PHD, Inc. v. Bank One, NA,* 2004 WL 3721325 (N.D.Ohio 2004). In *PHD, Inc.,* the official committee of unsecured creditors ("committee") of a bankrupt appliance manufacturer, PHD, brought a cause of action against one of PHD's former directors, Daniel Phlegar. The committee alleged that, upon PHD's insolvency, Phlegar breached his fiduciary duty to creditors of the corporation by failing to take

actions to mitigate the impact of misrepresentations including misstatements of the corporation's inventory. As a consequence of this breach, according to the committee, the unsecured creditors were harmed and Phlegar should be liable for damages.

In dismissing the committee's claim against the director, the court noted that the use of the word "may" in Ohio Rev. Code § 1701.59(E) should be interpreted to permit, but not require, directors to consider the interests of creditors in making corporate decisions. *PHD, Inc.,* 2004 WL 3721325, at *4–5. The court relied on the general rule of statutory construction that the word "may" is to be construed as permissive unless there is a clear and unequivocal legislative intent that the word receive a construction other than its ordinary usage. *Id.* at *5. *See also Dept. of Liquor Control v. Sons of Italy Lodge 0917,* 65 Ohio St.3d 532, 605 N.E.2d 368, 370 (1992) (discussing the "long relied on" rule of construction that the word "may" is to be construed as permissive unless there is clear legislative intent to the contrary). The court found no such clear and un-

"sword" by creditors seeking to bring a suit against directors directly on their own behalf. *See Official Committee of Unsecured Creditors v. Fleet Retail Finance Group (In re Hechinger Investment Co. of Delaware ),* 274 B.R. 71, 89–90 (D.Del.2002) (concluding that in an insolvency situation, directors are playing with creditors' money and, consequently, their duty runs to creditors as well as shareholders and other constituencies); *Miramar Resources, Inc. v. Shultz,* 208 B.R. 723, 729 (Bankr.M.D.Fla.1997).

Since writing *Credit Lyonnais,* the Delaware Court of Chancery has had opportunity to revisit these issues and has backed away from the premise that directors of an insolvent corporation owe their primary duty directly to creditors. *Production Resources Group,* 863 A.2d at 787–88 (recognizing the oddity of its *Credit Lyonnais* decision, which emphasizes director discretion during insolvency, being read by some as creating a new body of creditor's rights law). In *Production*

*Resources,* the Delaware Court of Chancery reemphasizes that even in insolvency, the directors' primary fiduciary duty is to the corporate enterprise itself and as such, the directors may continue to engage in reasonable business activities that involve risk even if that course of action would not be advocated by creditors. *Id.* at 788, n. 52 (noting that the business judgment rule applies in insolvency). Furthermore, the harm caused by a director's failure to responsibly manage the corporate assets or maximize their value is a harm to the corporation itself and, as such, can only be asserted by creditors through a derivative claim. *Id.* at 792–93.

In the final analysis, while these cases from other jurisdictions are instructive, none addresses the key issue faced by this court: whether expanding a director's fiduciary duty to creditors upon a corporation's insolvency is precluded by Ohio statutory law codifying the directors' standard of care owed to a corporation and other constituencies.

equivocal intent to give "may" a different meaning. Instead, the court cited the Committee Report from the 1984 Act promulgating § 1701.59(E) which confirms the permissive nature of a director's consideration of creditor interests. *PHD, Inc.*, 2004 WL 3721325, at *5. The report states:

> The Committee believes that Ohio law presently permits a director to take into account interests other than those of shareholders; however, the Committee believes that it is desirable to specify and clarify the breadth of the interests which a director may consider.

*Id.* Because Ohio Rev.Code § 1701.59(E) permits, but does not require directors to consider the interests of creditors, the court in *PHD, Inc.*, determined that § 1701.59(E) precluded any claims based on a mandatory duty of directors to creditors. *Id.*

The Liquidating Trustee disagrees with the holding in *PHD, Inc.* and cites conflicting case law to support the view that a director has a fiduciary duty directly to creditors upon a corporation's insolvency pursuant to Ohio law. In *DeNune III v. Consolidated Capital of North America, Inc.*, a receiver appointed to prevent the dissipation of corporate assets filed a lawsuit against directors of the corporation for claims including breach of fiduciary duty arguing that the defendants owed a duty to creditors not to waste corporate assets. 288 F.Supp.2d 844, 855 (N.D.Ohio 2003). The court concluded that the receiver's claims withstood the defendants' motion to dismiss because, "[u]nder long-standing Ohio law," officers and directors of an insolvent corporation "owe a fiduciary duty to the corporation itself and to its creditors not to waste corporate assets which otherwise could be used to pay corporate debts." *Id. See also In re National Century Financial Enterprises, Inc. Investment Litig.*, 2006 WL 469468, at * 12

(S.D.Ohio Feb.27, 2006) (quoting from the *DeNune* case). In contrast to the *PHD, Inc.* case which turned on statutory construction, the district court in *DeNune* did not address Ohio Rev.Code § 1701.59(E) and its impact on a director's fiduciary duties or discuss any other Ohio statutory law codifying the fiduciary obligations of directors. Instead, the court looked to common law, particularly the Ohio Supreme Court case of *Thomas v. Matthews*, 94 Ohio St. 32, 113 N.E. 669 (1916), for the "long-standing Ohio law" as to a director's fiduciary duty to creditors when a corporation is insolvent.

In *Matthews*, although it was not the primary focus of the case, the Supreme Court of Ohio reviewed the propriety of a decision by a board of directors not to declare dividends during certain years that the corporation experienced significant indebtedness and had a "petition of dissolution" filed against it. 113 N.E. at 672–73. In determining that the directors' decision to cease payments of dividends was appropriate during insolvency and the pending petition of dissolution, the Supreme Court of Ohio stated:

> The directors of a corporation not only stand in the relation of trustees to the stockholders, but, where a corporation is insolvent or threatened with insolvency, or where a suit for dissolution is pending, they stand in the relation of trustees to the creditors, and are not permitted to divert assets from the payment of [corporate] debts by distributing these assets to the stockholders as dividends; neither can they be permitted to anticipate the action of the court. It is their duty to conserve these assets until the final judgment of the court in the dissolution proceedings, and deliver the same to the receiver appointed by the court, if one should be appointed. Any distribution of its assets in dividends or any

application of its funds to other than corporate business pending such an action would be at their peril. *Id.* at 673. While the *Matthews* court discusses a "trustee" relationship between a director and creditors upon insolvency, it is clear from the quoted language above that the director's duty to creditors as a "trustee" is limited. Upon insolvency, the *Matthews* court held that directors of a corporation are no longer permitted to waste or divert assets by transferring them to stockholders in the form of dividends. *Id.* Indeed, the court's determination that directors must cease the payment of dividends when a corporation is insolvent is an established principle of corporate governance that is now codified in Ohio statutory law. *See* Ohio Rev.Code § 1701.33(C).

However, outside of this limited duty to cease dividend payments, there is nothing in the *Matthews* case that suggests to this court that a director's duty to creditors upon insolvency expands to the same fiduciary obligations that a director

owes to the corporation itself. All other discussions in the *Matthews* decision of a director's duty to hold assets in "trust" and conserve them for payment of debts is limited to when a dissolution proceeding is pending rather than upon insolvency. *Matthews*, 113 N.E. at 673. Indeed, to read *Matthews* more expansively to require directors to hold assets in trust and distribute them to creditors upon insolvency would, in essence, require an insolvent company to immediately cease operations and liquidate. Such a reading is not only contrary to the plain language of Ohio Rev.Code § 1701.59(E), but also runs afoul of general corporate law principles which allow an insolvent company to continue to operate with aspirations of turning a profit.[7]

That is not to say that the broad principle of Ohio law enunciated by the *Matthews* court is completely incorrect or obsolete. Once a corporation becomes insolvent and begins an inevitable slide towards liquidation, the malfeasance or misfeasance of directors can have di-

7. Even jurisdictions recognizing that directors of an insolvent corporation have a fiduciary duty to creditors as the residual owners of the corporation do not require the directors to treat the assets as a trust for the benefit of those creditors. *See, Production Resources Group*, 863 A.2d at 788 n. 52 (noting that insolvency is not a "magic dividing line that should signal the end to some, most, or all risk-taking on behalf of stockholders or even on behalf of creditors...."); *Kittay v. Atlantic Bank of New York (In re Global Service Group, LLC )*, 316 B.R. 451, 460 (Bankr.S.D.N.Y.2004) (recognizing that the "fiduciaries of an insolvent business might well conclude that the company should continue to operate in order to maximize its 'long-term wealth creating capacity' " and that chapter 11 is founded on the notion that a business is worth more to everyone alive than dead); *Steinberg v. Kendig (In re Ben Franklin Retail Stores, Inc.)*, 2000 WL 28266, at *4 (N.D.Ill. Jan.12, 2000). Instead, these jurisdictions recognize that cred-

itors are just one constituency of the corporate enterprise whose interests should be considered when a corporation is facing a financial crisis. Consequently, directors of an insolvent corporation are not required to immediately liquidate assets, even if such action is advocated by creditors, any more than they are required to take extremely risky actions on behalf of the stockholders. *Production Resources*, 863 A.2d at 790 n. 57 (stating that the directors' duty to responsibly maximize corporate value may require them to pursue a strategy that neither the stockholders nor the creditors prefer); *Ben Franklin*, 2000 WL 28266 at *4. When a corporation is insolvent or threatened with insolvency, the directors' primary duty is to the corporate enterprise and the business judgment rule remains in place to protect the directors' ability to "make a range of good faith, prudent judgments about the risks they should take on behalf of troubled firms." *Production Resources*, 863 A.2d at 788 n. 52.

sastrous consequences for creditors. However, the gradual accretion of legislation since 1916 and an evolved view of insolvency and corporate reorganization have replaced or limited some early common law precepts. As already noted, in *Matthews*, the corporation was not only insolvent but actually subject to a dissolution proceeding and the court, in the absence of statutory authority, invoked a common law principle to protect the corporation and its creditors from a claimed contractual right to receive dividends. Today, the court would have relied upon Ohio Rev.Code § 1701.33(C) which specifically forbids the issuance of dividends by an insolvent corporation and Ohio Rev.Code § 1701.95 which outlines the liability of directors for prohibited loans, dividends, or other asset distributions.

Further examination of this "long-standing Ohio law" confirms that the broad common law principle casting directors as trustees on behalf of creditors rests on narrow facts that generally fit within the ambit of current statutory law. *Matthews*, in defining the fiduciary duties of directors of an insolvent corporation, cited as its sole precedential authority a decision from 1868, *Goodin v. Cincinnati and Whitewater Canal Company*, 18 Ohio St. 169 (1868). In *Goodin*, directors of two railroad companies desired to acquire real estate owned by a failing canal company. The railroad company directors purchased shares of the canal company and managed to take control of the canal company's board of directors prior to instituting condemnation proceedings to acquire the desired real estate, thereby ensuring a low purchase price. They simultaneously acquired at discounted cost the canal company's mortgage debt. The common president to both railroad companies and the canal company was then appointed receiver in the pending mortgage foreclosure proceedings of the desired real estate. The result of these maneuverings was that the railroad companies obtained the real estate for "such a gross inadequacy of price as to shock the moral sense" and minority shareholders and unsecured creditors of the canal company were correspondingly prejudiced. *Id.* at 182. The court also noted the serious conflicts of interest of the directors and the fact that there had been "in effect, a sale by a trustee to himself." *Id.* The court held that the railroad company had to account to the canal company for the value of the real estate less the amount already paid. *Id.* at 183.

The *Goodin* court, proceeding in equity, protected minority shareholders as well as creditors of an insolvent corporation, in part, by invoking common law trust fund doctrine.[8] Under contemporary Ohio law, the case would most likely have been brought as a derivative action by shareholders of the canal company invoking Ohio Rev.Code § 1701.59 and perhaps as a fraudulent transfer action by the creditors

---

**8.** "It is ... well settled that the property of a corporation is a trust fund in the hands of its directors, for the benefit of its creditors and stockholders." *Goodin*, 18 Ohio St. at 182. Although the canal company was likely insolvent, the *Goodin* court did not expressly note that fact and was more offended by the duplicity and blatant conflicts of interest of the railroad company officers and directors. "To undertake, by getting control of the company, and then, under pretence of acting as *agents* and trustees for all* the stockholders and creditors, deliberately to trample under foot the rights of the minority, is rather a sharp practice, and one which a court of equity will never tolerate." *Id.*, at 182–83 (emphasis in the original). Absent the acknowledgment of insolvency, the court's broad statement of the "well settled" "trust fund" principle is clearly at odds with current law respecting the fiduciary duties of directors.

pursuant to Ohio Rev.Code § 1336.01 *et. seq.* Furthermore, both the *Matthews* and *Goodin* cases involved insolvency-related judicial proceedings—involuntary corporate dissolution in *Matthews* and foreclosure/receivership in *Goodin*—which, under equivalent current law, would require judicial oversight and the advancement of creditors' rights over those of shareholders or owners. *See, e.g.,* Ohio Rev.Code § 2735.01 (appointment of receiver); Ohio Rev.Code §§ 1701.86–1701.90 (voluntary dissolution); Ohio Rev.Code § 1701.91 (judicial dissolution); Ohio Rev.Code § 2329 *et seq.* (foreclosure; execution against property); 69 Ohio Jur.3d *Mortgages* § 280 *et. seq.* (2006). Likewise, modern bankruptcy law provides a comprehensive framework of laws within which creditors are owed a fiduciary duty and corporate assets can be liquidated or recovered. All of these creditor remedies provide the direct fiduciary duty to creditors and the equality of treatment of equivalent creditors that early trust fund case law suggests should apply where a corporation is terminally insolvent or directors or officers are engaged in self-dealing.[9]

The point is that Ohio law respecting duties owed by directors to the corporate creditors cannot be discerned simply by reference to general statements contained in decisions rendered more than 80 years ago without consideration of intervening statutory enactments. As the prior discussion reveals, *Matthews* and *Goodin* were decided on much narrower grounds than their broad pronouncements might suggest,[10] and the specific harms those cases sought to remedy are now the subject of legislation. Some of the common law corporate principles such as the "trust fund doctrine" have been gradually supplanted or modified by statutes aimed at protecting directors on the one hand and providing remedies to creditors on the other.

Ohio statutes protecting directors and defining their duties were significantly altered in the 1980's, particularly in 1984 and 1986 with the specific intent of bolstering protection of directors from litigation. *See* Deborah Cahalane, Comment, *1986*

9. A particularly thorough and thoughtful discussion of the relationship between directors and creditors of insolvent corporations and, particularly, the protection of creditors by means of their contractual agreements, fraudulent transfer laws, and federal bankruptcy law is contained in *Production Resources*, 863 A.2d at 772. "This view of the common law of corporations [that directors can be directly liable to creditors for breaches of fiduciary duty] is not unproblematic. Arguably, it involves using the law of fiduciary duty to fill gaps that do not exist. Creditors are often protected by strong covenants, liens on assets, and other negotiated contractual protections. The implied covenant of good faith and fair dealing also protects creditors. So does the law of fraudulent conveyance. With these protections, when creditors are unable to prove that a corporation or its directors breached any of the specific legal duties owed to them, one would think that the conceptual room for concluding that the creditors were somehow, nevertheless, injured by inequitable conduct would be extremely small, if extant." *Id.* at 789–90.

10. It is doubtful that either court actually contemplated a direct action by creditors against directors. The *Matthews* court, when postulating the effect on creditors of a hypothetical payment of dividends under the circumstances of "enormous" corporate indebtedness, suggested that it "would be an invitation to ... creditors to intervene to protect their rights by the immediate appointment of a receiver." *Matthews*, 113 N.E. at 673. In *Goodin*, the court seems to *suggest derivative rights rather than direct* action when speaking of the nature of director duties and liabilities: "He is trustee for the *company*, and whenever he acts against *its* interests ... he is guilty of a breach of trust, and a court of equity will set his acts aside, at the instance of stockholders or creditors who are damnified thereby." *Goodin*, 18 Ohio St. at 183 (emphasis in the original).

*Ohio Corporation Amendments: Expanding the Scope of Director Immunity,* 56 U. Cin. L.Rev. 663 (1987); *Radol,* 772 F.2d at 256. Other statutes, as previously noted, prohibit actions by directors that are detrimental to the interests of creditors, actions such as issuing dividends or making distributions to shareholders when the corporation is insolvent or in dissolution. *See* Ohio Rev.Code §§ 1701.33(C) and 1701.95. These statutes are part of the comprehensive body of corporate law now governing insider transactions and defining in reasonable detail the fiduciary duties and liabilities of directors.

 This comprehensive body of law includes Ohio Rev.Code § 1701.59 that now defines the extent of a director's fiduciary duties. The plain language of Ohio Rev.Code § 1701.59(E) clarifies that a director has discretion to consider many constituencies of the corporate enterprise, including creditors, when making corporate decisions. However, a director has no distinct legal obligation directly to creditors, separate from the corporate entity as a whole, even when a corporation has reached the point of insolvency. The court concludes that while a company operates outside a pending dissolution, receivership, bankruptcy, or similar formal insolvency proceeding the directors' fiduciary obligations remain to the corporation and its shareholders and they are under no obligation to treat the corporate assets as a "trust" that must be liquidated on behalf of creditors. The court concurs with the analysis in *PHD, Inc.* that the explicit language of Ohio Rev.Code § 1701.59(E) forecloses any claim against a director for breach of a fiduciary duty directly to creditors upon insolvency.[11] 2004 WL 3721325, at *5.

## 2. The Liquidating Trustee States a Claim for Breach of Fiduciary Duties to the Corporation

 In Ohio, a plaintiff states a claim for breach of fiduciary duty by alleging the existence of a duty on the part of the alleged wrongdoer not to subject such person to the injury complained of, a failure to observe that duty, and an injury proximately resulting therefrom. *McConnell v. Hunt Sports Enterprises,* 132 Ohio App.3d 657, 725 N.E.2d 1193, 1215 (1999). The Liquidating Trustee's complaint alleges that: 1) Amcast's officers and directors have a fiduciary duty to Amcast; 2) the duty was breached when they failed to adhere to the terms of the Pension Plan, SERP, and Rabbi Trust through the restructuring of the plans and through allegedly prohibited payments to Ladehoff while Amcast was insolvent; and 3) the breach caused harm to Amcast in the form of the costs of the restructuring, possible diversion of funds from the annuity, and the loss of funds wrongly paid to Ladehoff. Based upon its foregoing analysis of Ohio law pertaining to the fiduciary obligations of officers and directors, the court concludes that the Liquidating Trustee's Complaint states a claim against the directors

---

11. The court takes no position regarding whether creditors of an insolvent corporation may bring a *derivative* claim for breach of a director's fiduciary duty to the corporation pursuant to Ohio law. *See Production Resources,* 863 A.2d at 792 (concluding that, under Delaware law, creditors may bring a derivative claim based on the director's breach of fiduciary duty to the corporation when the alleged breaches diminish the firm's value and indirectly harm creditors); *Rafool v. Goldfarb Corp. (In re Fleming Packaging Corp.),* 2005 WL 2205703, at *4 (Bankr. C.D.Ill. Aug.26, 2005). Because the Liquidating Trustee's Complaint already includes Amcast's claim for breach of fiduciary duty to the corporation based on an alleged diminishing of corporate value, the issue is moot in this case.

and officers for breach of fiduciary duty to Amcast.

■ Nonetheless, the Defendants argue that the Liquidating Trustee's claims should be dismissed based on facts that do not appear in the Complaint. The Defendants request that the court consider their view that Amcast was benefited rather than injured by the restructuring of the Pension Plan, SERP, Rabbi Trust, and annuity because of a large annuity refund. Furthermore, they assert that Amcast was not insolvent at the time payments were made to Ladehoff. As support, the Defendants attach Amcast's annual 10–K filings with the SEC and argue that the court may consider such materials outside the pleadings because they are public records.

■ While the Defendants' factual allegations and materials will certainly be relevant at trial, the court is precluded from considering them on a Rule 12(b)(6) dismissal motion. At this juncture, the "court's function is not to weigh the evidence or assess the credibility of witnesses . . . but to examine the complaint and determine whether the plaintiff has pleaded a cognizable claim." *Perry,* 90 Fed.Appx. at 861. Even materials that are public record should be excluded at this stage unless they reiterate what is stated in the complaint. *Hartman & Tyner, Inc. v. Charter Township of West Bloomfield,* 985 F.2d 560, 1993 WL 15130, at n. 3 (6th Cir. Jan.22, 1993) (recognizing that the consideration of any materials outside the complaint, including public records, requires the court to convert the motion to a motion for summary judgment).

■ The court recognizes its discretion to consider such extraneous materials if it converts the motion to one for summary judgment and provides the parties notice and a reasonable opportunity to supplement. *Id.* Specifically, Rule 12(b)(6) provides:

> If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all materials made pertinent to such a motion by Rule 56.

Fed.R.Civ.P. 12(b). However, because the Liquidating Trustee has not had the opportunity for formal discovery at this early stage, the court believes such a conversion is premature and, instead, will treat the motion as a motion to dismiss by excluding all facts and materials extraneous to the Complaint.

■ The Defendants next argue that the breach of fiduciary duty claims should be dismissed because directors and officers have no fiduciary duty when restructuring a pension plan. It is true that when a board of directors acts as a plan sponsor of an ERISA qualified plan, the board's decision to amend that plan does not trigger ERISA fiduciary obligations to the plan and plan participants. *Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 443, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999); *Lockheed Corp. v. Spink,* 517 U.S. 882, 890, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996) (holding that employers and other plan sponsors are generally free under ERISA to adopt, modify or terminate a welfare plan at any time). However, a possible exception is noted in cases involving sham transactions, unlawful transfers to parties in interest or a kickback scheme. *Spink,* 517 U.S. at 895 n. 8, 116 S.Ct. 1783. Such transactions are alleged in this case. Furthermore, it is not clear that the holdings in *Hughes* and

*Spink* in any way limit the directors' general fiduciary obligations to Amcast itself rather than the plan and plan participants. Finally, even if the changes to the ERISA qualified plan did not trigger fiduciary obligations on the part of the directors, the transactions also had the effect of shifting benefits away from the SERP and Rabbi Trust. The parties have not addressed whether the restructuring of these non-ERISA qualified plans may trigger fiduciary obligations on the part of the directors.

For these reasons, the court concludes that the Liquidating Trustee sufficiently states a claim that the directors and officers breached their fiduciary duty to Amcast.

### 3. The Liquidating Trustee Fails to State a Claim for Breach of Fiduciary Duties to Creditors

■ The Liquidating Trustee's Complaint includes a claim that the officers and directors breached their fiduciary duty to creditors because the alleged restructuring of benefits and payouts to Ladehoff occurred when Amcast was insolvent or threatened with insolvency. However, pursuant to the court's previous analysis of Ohio law, the court concludes that Ohio Rev.Code § 1701.59(E) precludes such a claim based on a direct fiduciary duty to creditors upon insolvency.[12] *See generally PHD, Inc.,* 2004 WL 3721325. Consequently, the Liquidating Trustee's claim

based on the directors' breaching their fiduciary duty to creditors is dismissed.

### C. *Count Two: Aiding and Abetting Breaches of Fiduciary Duties*

■ Count Two of the Complaint is a claim that the Defendants aided and abetted breaches of fiduciary duties. In the Complaint, the Liquidating Trustee alleges that the Defendants improperly authorized or permitted the wrongful transactions at issue thereby aiding and abetting breaches of fiduciary duty that the Defendants owed to Amcast and its creditors.[13]

The Supreme Court of Ohio has recognized the claim of aiding and abetting breach of fiduciary duty through its adoption of § 876(b) of the Restatement (Second) of Torts which provides, "[f]or harm resulting to a third person from the tortious conduct of another, one is subject to liability if he ... knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself[.]" *Great Central Ins. Co. v. Tobias,* 37 Ohio St.3d 127, 524 N.E.2d 168, 172 (1988). *See also Aetna Casualty and Surety Co. v. Leahey Constr. Co., Inc.,* 219 F.3d 519, 533 (6th Cir.2000).

■ Section 876(b) of the Restatement (Second) of Torts sets forth two required elements: (1) knowledge that the primary party's conduct is a breach of duty; and (2) substantial assistance or encouragement to the primary party in carrying out

12. It is true that Ohio Rev.Code § 1701.59(E) applies only to directors and there is no comparable Ohio legislation containing the same degree of specificity with respect to the fiduciary duties and liabilities of corporate officers. However, as previously noted (*see* footnote 4), the authority of officers is derivative and the standard of care to which they are held is no more than commensurate with that of directors. It would be unorthodox, if not absurd, to hold that officers, but not directors, have a direct duty to creditors upon a corporation's insolvency.

13. To the extent the Liquidating Trustee bases this claim of aiding and abetting on a fiduciary duty owed by directors and officers to creditors, it is dismissed. As noted previously, the Liquidating Trustee has failed to show that the directors and officers owed a fiduciary duty directly to creditors during the time of the transactions at issue in this case.

the tortious act. *Aetna Casualty*, 219 F.3d at 533. Although not discussed in the cases recognizing the cause of action in Ohio, the action, by its nature, further requires participation by a non-fiduciary defendant. *See Rubin v. Posner*, 701 F.Supp. 1041, 1052 (D.Del.1988); *Carlson v. Hallinan*, 2006 WL 771722, at *20 (Del. Ch. March 21, 2006).

In this case, the Defendants request that the claim be dismissed because the Complaint alleges that all of the Defendants are fiduciaries in relation to Amcast and, thus, there is no participation by a non-fiduciary. While conceding this to be true, the Liquidating Trustee argues that, at this stage, he is allowed to plead conflicting causes of action in the alternative, especially since the court may conclude that some of the Defendants are not fiduciaries.

The court agrees with the Liquidating Trustee that, at this early stage of the case, he is permitted to plead this claim in the alternative and has sufficiently done so to meet notice pleading requirements. *See Toledo Blade Newspaper Unions–Blade Pension Plan v. Investment Performance Services, LLC*, 373 F.Supp.2d 735, 750 (N.D.Ohio 2005) (denying a motion to dismiss and allowing conflicting alternative claims to be pleaded against the defendants as both fiduciaries and non-fiduciaries when the evidence has not yet shown whether the defendants are fiduciaries). The Court denies the Defendants' motions to dismiss Count Two.

### D. *Count Three: Negligence*

 To establish a claim for common law negligence in Ohio, the Liquidating Trustee must establish that: 1) a duty

exists; 2) the duty was breached; and 3) the damage was proximately caused by the breach. *Lutz v. Chitwood (In re Donahue Securities, Inc.)*, 318 B.R. 667, 673 (Bankr. S.D.Ohio 2004). Basically, a claim for negligence is the same as a claim for breach of fiduciary duty except that a breach of fiduciary duty claim involves a higher standard of care. *Id.* at 676 (quoting *Strock v. Pressnell*, 38 Ohio St.3d 207, 527 N.E.2d 1235, 1243 (1988)).

Because of these similarities, the Defendants argue the same basic reasons for dismissing both the fiduciary duty and negligence claims. The Defendants maintain that based on material facts not found in the Complaint, the Liquidating Trustee will be unable to show that the officers and directors breached their duty to Amcast or that Amcast suffered damages as a result.

 As noted previously, the court is precluded from considering these extraneous facts on a Rule 12(b)(6) dismissal motion. *Perry*, 90 Fed.Appx. at 861. For this reason, the court will deny the Defendants' motions to dismiss the Liquidating Trustee's negligence claim.[14]

### E. *Count Four: Conversion*

 The Liquidating Trustee's Complaint includes a claim of conversion against all of the Defendants for allegedly converting funds that include those in the Rabbi Trust. In Ohio, "conversion" is defined as the "wrongful exercise of dominion over property to the exclusion of the rights of the owner, or withholding it from his possession under a claim inconsistent with his rights." *Joyce v. General Motors Corp.*, 49 Ohio St.3d 93, 551 N.E.2d 172, 175 (1990); *State Farm Mutual Auto. Ins.*

---

**14.** To the extent the Liquidating Trustee bases this claim of negligence on a duty owed by directors and officers to creditors, it is dismissed. As noted previously, the Liquidating Trustee has failed to show that the directors and officers owe a duty directly to creditors during the time of the transactions at issue in this case.

*Co. v. Advanced Impounding and Recovery Servs., Ltd.,* 165 Ohio App.3d 718, 848 N.E.2d 534, 537 (2006). This definition requires proof of three elements: 1) a defendant's exercise of dominion or control; 2) over a plaintiff's property; 3) in a manner inconsistent with the plaintiff's rights of ownership. *State Farm Mutual,* 848 N.E.2d at 537. If a defendant came into possession of the property lawfully, the plaintiff must prove two additional elements: 1) that it demanded the return of the property; and 2) that the defendant refused to deliver the property to the plaintiff. *Id.*

The Defendants argue that the Liquidating Trustee's Complaint fails to state a claim because: 1) the funds that were converted are not specifically identified; 2) the transfers of Rabbi Trust funds to Ladehoff were lawful and complied with the Executive Agreement's requirements; and 3) the Liquidating Trustee has failed to establish that creditors had an ownership interest in the trust funds at the time of the conversion.

First, the court concludes that the Liquidating Trustee has sufficiently identified the allegedly converted funds as those transferred from the Rabbi Trust. [Complaint, ¶ 76.] Second, the court reiterates its unwillingness to consider the Defendants' extraneous facts asserted to demonstrate that the Ladehoff transfers complied with legal and contractual requirements. *Perry,* 90 Fed.Appx. at 861.

 Finally, the court agrees with Defendants that the Liquidating Trustee must allege a property interest in the trust funds that were converted. *See State Farm Mutual,* 848 N.E.2d at 537; *Wheaton v. Chandler,* 68 Ohio App. 474, 42 N.E.2d 193, 194 (1941) (claim is sufficient if plaintiff has a lien on the property allegedly converted). However, the court determines that this fact has been sufficiently pleaded through the Complaint's incorporation of the terms of the Trust Agreement and the Complaint's allegations that Amcast was insolvent at the time of the transfers to Ladehoff. According to the terms of the Trust Agreement, upon Amcast's insolvency, trust fund payments to beneficiaries are to cease and the funds are to be subject to the claims of creditors. [Complaint, ¶¶ 39–40 and Ex. D, Sections 6.1–6.3.] Because an interest in the funds has been sufficiently pleaded, the court denies the Defendants' motion to dismiss Count Four.

### F. Count Five: Unlawful Distribution and Waste of Corporate Assets

 The Liquidating Trustee's Complaint alleges that the Defendants made wrongful distributions and/or wasted corporate assets in disregard of the rights and interests of Amcast and its creditors. Ohio has recognized that directors are bound by their fiduciary obligations to care for corporate property and conduct and manage corporate affairs in good faith. Ohio Rev.Code § 1701.59 and § 1701.60; *Selama–Dindings Plantations, Ltd. v. Durham,* 216 F.Supp. 104, 114 (S.D.Ohio 1963) (*citing Goff v. Emde,* 32 Ohio App. 216, 167 N.E. 699, 700 (1928)). Corporate waste occurs when corporate fiduciaries cause the corporation to enter a "transaction on terms that no person of ordinary, sound business judgment could conclude represent a fair exchange." *In re LTV Steel Co., Inc.,* 333 B.R. 397, 424 (Bankr. N.D.Ohio 2005) (as defined under Delaware law).[15]

---

15. Because the corporate waste doctrine is based on the directors and officers' fiduciary obligations to the corporation, the court questions whether it is necessary that the Liqui-

Defendants argue that this claim should be dismissed because extraneous facts they allege demonstrate that all transactions at issue were fair to the corporation and actually improved Amcast's cash flow. However, as noted previously in this decision, the court is unwilling to consider facts outside the Complaint. Therefore, the facts alleged by Defendants to support their contention that the transactions at issue were fair to the corporation will not be considered by the court. Ladehoff separately argues that the distributions to him cannot be unlawful or wrongful where the corporation is merely complying with its obligations under a legally binding contract. However, under the terms of the Trust Agreement, such payments were not authorized if Amcast was insolvent at the time. Amcast's insolvency remains at issue in this case and, again, the court may not consider controverting extraneous facts in the context of a Rule 12(b)(6) dismissal motion. Consequently, the Liquidating Trustee's claim withstands dismissal.

### G. *Count Six: Deepening Insolvency*

Count Six of the Liquidating Trustee's Complaint is a claim for deepening insolvency, an emerging and somewhat convoluted theory that "has not been uniformly applied nor universally embraced." *Rafool v. Goldfarb Corp. (In re Fleming Packaging Corp.)*, 2005 WL 2205703, at *7 (Bankr.C.D.Ill. Aug.26, 2005). *See also Del–Met Corp.*, 322 B.R. at 807. Nor, for that matter, has it been precisely defined. At its essence, the theory refers to the fraudulent prolongation of a corporation's life or expansion of its debt beyond insol-

vency in a manner resulting in a further dissipation of assets and, in some circumstances, a costly bankruptcy filing. *Fleming Packaging*, 2005 WL 2205703, at *7; *Alberts v. Tuft (In re Greater Southeast Community Hosp. Corp. I )*, 333 B.R. 506, 516 (Bankr.D.C.2005) ("the *sine qua non* of the concept is that the defendant breached some pre-existing duty of care owed to the corporation in deepening its insolvency"). The Defendants in this case argue that the claim must be dismissed because deepening insolvency is not a cause of action recognized under Ohio law. The Liquidating Trustee responds that the theory is growing in acceptance and would be recognized in Ohio as a sound remedial tort that seeks to remedy harms caused by directors and officers of a corporation who exacerbate the financial difficulties of an already troubled business.

The Third Circuit's opinion in *Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., Inc.* is recognized as one of the first to flesh out deepening insolvency as a valid cause of action under state law. 267 F.3d 340 (3rd Cir.2001). *See also OHC Liquidation Trust v. Credit Suisse First Boston (In re Oakwood Homes Corp.)*, 340 B.R. 510, 529–31 (Bankr.D.Del. 2006) (describing the history of deepening insolvency and its evolution from a theory of harm to a distinct cause of action). In *Lafferty*, two lease financing corporations were operated as a Ponzi scheme until the companies collapsed causing serious losses to investors and creditors. *Lafferty*, 267 F.3d at 343. A committee of creditors was appointed which, on behalf of the debtor-corporations, sued several third party pro-

---

dating Trustee plead corporate waste as a cause of action separate and distinct from breach of fiduciary duty. Nonetheless, the Defendants do not challenge the sufficiency of the Complaint on this basis and the court recognizes that other jurisdictions allow cor-

porate waste to be pleaded as a separate claim. *See LTV Steel*, 333 B.R. at 424–25 (recognizing corporate waste as a colorable claim in Delaware). As such, the court will allow the claim to stand at this early juncture in the litigation process.

fessionals alleged to have conspired with the debtors' management to fraudulently induce the "corporations to issue the debt securities, thereby deepening their insolvency and forcing them into bankruptcy." *Id.* at 344. The Third Circuit was faced with deciding whether the theory of injury, deepening insolvency, was cognizable under Pennsylvania law when no Pennsylvania Supreme Court or intermediate court had directly addressed the issue. *Id.* at 344–45.

In making its determination that deepening insolvency was a valid cause of action, the Third Circuit considered several factors. First, the court found that the theory was sound because the extension of a corporation's life beyond insolvency may indeed cause injury by dissipating the corporation's remaining assets, hindering its ability to operate, undermining its relationships with customers and suppliers, and, possibly, forcing the corporation into a costly bankruptcy. *Id.* at 349–350. These harms could be averted or minimized if the corporation would be dissolved in a timely manner "rather than kept afloat with spurious debt." *Id.* at 350. The Third Circuit also noted that a growing number of federal courts were recognizing that a corporation can suffer an injury from actions that fraudulently extend its life and dissipate its assets. *Id.* Finally, the court determined that Pennsylvania jurisprudence was based on venerable common law principles including that, where there is an injury, the law provides a remedy. *Id.* at 351. The Third Circuit concluded that the Pennsylvania Supreme Court would recognize deepening insolvency as a valid cause of action.[16] *Id.*

Since the *Lafferty* decision was published, courts have dealt with the evolving theory of deepening insolvency in various and conflicting ways. Several federal courts, often interpreting state law within the Third Circuit, have recognized deepening insolvency as a valid cause of action. *Oakwood Homes Corp.*, 340 B.R. at 531; *LTV Steel*, 333 B.R. at 422 (determining that deepening insolvency would be a valid cause of action under Delaware and New Jersey law). While recognizing the cause of action, these courts do not necessarily agree over the elements of the claim. Questions remain regarding whether the deepening insolvency theory requires proof of fraudulent activities or only negligence. *See Oakwood Homes Corp.*, 340 B.R. at 534.

Significantly, a growing number of courts regard deepening insolvency with skepticism. Some have determined that the concept is not itself an independent tort and have consequently limited deepening insolvency to a means by which to measure damages caused by a breach of fiduciary duty or similar claim. *Alberts v. Tuft (In re Greater Southeast Community Hosp. Corp. I)*, 353 B.R. 324, 337–8 (Bankr.D.D.C.2006); *Amato v. Southwest Florida Heart Group, P.A. (In re Southwest Florida Heart Group, P.A.)*, 346 B.R. 897 (Bankr.M.D.Fla.2006) (finding no cognizable viable claim based on a theory of deepening insolvency, but determining that some factual issues may be relevant to the measure of damages). Similarly, other courts require proof that an independent duty was breached or a separate tort committed in the act of continuing a corporation and increasing its debt. *Del–Met Corp.*, 322 B.R. at 813 (requiring proof of a

---

**16.** Ultimately, the Third Circuit dismissed the case based on the affirmative defense of *in pari delicto. Lafferty*, 267 F.3d at 360. Consequently, the Third Circuit did not reach a decision on the elements that must be proven

in order to establish the cause of action and be entitled to damages. To date, this court has found no published decision awarding damages to a plaintiff based on a deepening insolvency cause of action.

breach of duty or commission of a separate tort); *Kittay v. Atlantic Bank of New York (In re Global Service Group, LLC)*, 316 B.R. 451, 458 (Bankr.S.D.N.Y.2004).

Moreover, a number of courts suggest that when deepening insolvency is applied to directors or officers who already have a fiduciary duty to the corporation, the cause of action should be dismissed as duplicative of a claim for breach of fiduciary duty. *Bondi v. Bank of America Corp. (In re Parmalat)*, 383 F.Supp.2d 587, 601–02 (S.D.N.Y.2005) (finding that a claim of deepening insolvency against directors and officers would duplicate a claim for breach of fiduciary duty under North Carolina law); *Official Committee of Unsecured Creditors v. American Tower Corp. (In re Verestar, Inc.)*, 343 B.R. 444, 475–78 (Bankr.S.D.N.Y.2006); *Fleming Packaging*, 2005 WL 2205703, at *7–10 (recognizing that a director's fiduciary duties already prohibit the type of conduct that forms the basis for deepening insolvency claims); *Greater Southeast Community Hosp.*, 333 B.R. at 517 (concluding that there was no point in recognizing and adjudicating a new cause of action like deepening insolvency when an established cause of action, breach of fiduciary duty, covered the same ground).

Even the Third Circuit itself, which has recently revisited the issue, questions the continuing validity of the claim and whether its previous decision in *Lafferty* was correctly decided. *Seitz v. Detweiler (In re CitX Corp., Inc.)*, 448 F.3d 672, 680 and n. 11 (3rd Cir.2006). While the Third Circuit reiterates that deepening insolvency remains a cause of action under Pennsylvania law, the court suggests that the cause of action should not be expanded to

negligent acts nor should the doctrine necessarily be extended to other states. *Id.*

The most critical treatment of the deepening insolvency theory is found in a recent opinion from a Delaware court in *Trenwick America Litigation Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168 (Del. Ch.2006). In *Trenwick*, the Court of Chancery of Delaware rejects the deepening insolvency theory outright noting that while the term is "catchy," it does not express a coherent cause of action against directors of a corporation. *Trenwick*, 906 A.2d at 174.[17]

In *Trenwick*, the Delaware court begins with such general principles of corporate law as directors are expected to seek profit for stockholders, even at the risk of failure. *Id.* Furthermore, Delaware law imposes no absolute obligation on directors to cease operations and liquidate upon a corporation's insolvency. *Id.* at 204. Instead, directors may continue to take reasonable business risks and seek profitable strategies even when a corporation is insolvent. *Id.* at 205. By taking those risks, which may result in the incurrence of additional debt, a director does not become "a guarantor of that strategy's success." *Id.* Rather, in such situations, the director remains protected by the business judgment rule and, to conclude otherwise, would "fundamentally transform Delaware law." *Id.*

The Delaware court recognizes that there has always been a "traditional toolkit" of claims available to plaintiffs, such as breach of fiduciary duty and fraudulent conveyance, when a director acts disloyally, fraudulently, or without due care when implementing a business strategy while a company is insolvent. *Id.* However, when the elements of one of these traditional

---

17. The Delaware court's contemptuous view of the doctrine is made quite clear when it describes deepening insolvency as having "the kind of stentorious academic ring that tends to dull the mind to the concept's ultimate emptiness." *Id.* at 204.

claims cannot be demonstrated, the plaintiff may not cure the deficiency by simply alleging that the corporation was made more insolvent as a result of the failed strategy. *Id.* The Delaware court concludes that "deepening insolvency" is no more a cause of action when a firm is insolvent than a cause of action for "shallowing profitability" would be when a firm is solvent. *Id.* In rejecting deepening insolvency as an independent tort, the Delaware court states that it reaches "a result consistent with a growing body of federal jurisprudence which has recognized that those federal courts that became infatuated with the concept, did not look closely enough at the object of their ardor." *Id.* at 206.[18]

This court is now asked to jump into the fray and predict whether Ohio courts would recognize this controversial cause of action and, if so, to what degree. Although the Liquidating Trustee argues that deepening insolvency is widely accepted, the recent decisions from the Third Circuit and elsewhere suggest to this court that the tide has turned and courts are increasingly reluctant to recognize deepening insolvency as a legitimate claim.

The concerns raised in these recent decisions are valid. Deepening insolvency as a cause of action remains vague and convoluted. Certainly, the central ideology of the theory is true: actions taken which worsen the financial condition of an already insolvent corporation may harm the business and its constituents. However, "recognizing that a condition is harmful and calling it a tort are two different things." *Greater Southeast Community Hosp.*, 333 B.R. at 517. There is no need

to recognize a new cause of action when the traditional toolkit of claims against directors and officers of a corporation covers the same ground that a deepening insolvency cause of action would tread. *Id.* (noting that if officers and directors can be shown to have breached their fiduciary duty by deepening a corporation's insolvency, the resulting injury is compensable on a claim for breach of fiduciary duty). Indeed, the allegations in the Liquidating Trustee's Complaint demonstrate the duplicative nature of a deepening insolvency claim. The essential facts offered to support the Liquidating Trustee's claim that the Defendants deepened the insolvency of the corporation by restructuring certain benefits and transferring certain funds to Ladehoff are identical to the facts supporting the Liquidating Trustee's claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, as well as many of his other claims. The complete redundancy of the deepening insolvency claim provides this court with ample reason, by itself, for dismissing it as a cause of action.

More significantly, to the extent that a deepening insolvency claim is utilized to heighten or change a fiduciary's obligations when a corporation is underwater, the claim destroys the fundamental principles of corporate responsibility and the protections of the business judgment rule. As noted in the *Trenwick* case, if a plaintiff cannot state a claim that directors and officers breached their fiduciary duties in implementing a business strategy, that plaintiff may not cure the deficiency by simply alleging that the strategy made the

---

**18.** Following *Trenwick,* the Bankruptcy Court for the District of Delaware has concluded that no "deepening insolvency" cause of action exists under Delaware law and a board of directors is under no obligation to wind down operations and refuse to take on additional debt simply because a company is insolvent. *See Official Committee of Unsecured Creditors v. Tennenbaum Capital Partners, LLC (In re Radnor Holdings Corp.),* 353 B.R. 820, 842 (Bankr.D.Del.2006).

corporation more insolvent. *Trenwick,* 906 A.2d at 205. The adoption of such a cause of action would negate the business judgment rule and force directors of an insolvent corporation to be the personal guarantors of a business strategy's success. *Id.* Such a theory is inconsistent with the laws codified in Ohio which do not make the application of the business judgment rule contingent upon the solvency of the business. *See* Ohio Rev.Code § 1701.59. Furthermore, the deepening insolvency theory is in direct conflict with traditional concepts of corporate law that allow an insolvent business to continue operating in hopes of maximizing profits and turning its financial situation around rather than immediately ceasing operations and liquidating. *Trenwick,* 906 A.2d at 204. *See also Verestar,* 343 B.R. at 476–77; *Global Service Group,* 316 B.R. at 460 (recognizing that business reorganization is based on the generally accepted notion that a business is worth more to everyone alive than dead and, thus, there is no absolute duty under American law, in contrast to the laws of some foreign jurisdictions, to shut down and liquidate an insolvent corporation).

■ The court determines that, at its best, the deepening insolvency theory is redundant of traditional causes of action recognized under Ohio law. At its worst, the theory is inconsistent with principles of fiduciary responsibility and the business judgment rule codified in Ohio. For these reasons, the court concludes that Ohio courts would not recognize deepening insolvency as an independent cause of action.[19] The Liquidating Trustee's claim is dismissed.

**19.** While declining to recognize deepening insolvency as a valid cause of action, the court believes that the concept may be useful as a

### H. Count Seven: Fraudulent Transfer Under Ohio Rev.Code §§ 1336.04 and 1336.05—Claim Against Defendant Leo Ladehoff

With his seventh claim, the Liquidating Trustee focuses on Ladehoff and the transfers he received. He alleges a state law fraudulent transfer claim against Ladehoff pursuant to Ohio's version of the Uniform Fraudulent Transfer Act, Ohio Rev.Code § 1336.01 *et seq.* ("Ohio UFTA"). The complaint alleges that the transfers to Ladehoff were made with actual intent as well as constructive intent to hinder, delay or defraud creditors.

The Bankruptcy Code permits the Liquidating Trustee to seek avoidance of fraudulent transfers under applicable state laws including the Ohio UFTA pursuant to 11 U.S.C. § 544 and allows recovery of such transfers from the transferee pursuant to 11 U.S.C. § 550. The Liquidating Trustee's fraudulent transfer claim against Ladehoff is based on two Ohio UFTA statutory sections. The relevant portions of Ohio Rev.Code § 1336.04 provide:

(A) A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the claim of the creditor arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following ways:

(1) With actual intent to hinder, delay, or defraud any creditor of the debtor;

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and if either of the following applies:

measure of damages for breach of fiduciary duty or commission of an actionable tort.

(a) The debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;

(b) The debtor intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

Ohio Rev.Code § 1336.04. Alternatively, the Liquidating Trustee bases his Ohio UFTA claim on Ohio Rev.Code § 1336.05(A) which states:

(A) A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Ohio Rev.Code § 1336.05.

 Ladehoff argues that the fraudulent transfer claim must be dismissed regardless of which statutory section it is based upon because Amcast was legally bound to make the transfers to Ladehoff pursuant to the terms of the Executive Agreement. Making contractually mandated payments on an antecedent debt clearly constitutes "value" under Ohio Rev.Code § 1336.03. However, the Ohio UFTA requires more than the receipt of

value to negate a fraudulent transfer claim. Under either § 1336.04(A)(2) or § 1336.05, a constructively fraudulent transfer claim will be defeated by proof that reasonably equivalent value was received in exchange. *See Valley–Vulcan Mold Co. v. Ampco–Pittsburgh Corp. (In re Valley–Vulcan Mold Co.)*, 237 B.R. 322, 331 (6th Cir. BAP 1999) *aff'd* 5 Fed.Appx. 396, 398 (6th Cir.2001); *In re Jones*, 305 B.R. 276, 280 (Bankr.S.D.Ohio 2003).[20] While not dispositive, receipt of reasonably equivalent value also constitutes a significant defense to an actual intent to defraud claim under Ohio Rev.Code § 1336.04(A)(1). *See Valley–Vulcan*, 237 B.R. at 331; *Baker & Sons Equipment Co. v. GSO Equipment Leasing, Inc.*, 87 Ohio App.3d 644, 622 N.E.2d 1113, 1118 n. 4 (1993).

Factual issues exist as to whether the value received by Amcast was reasonably equivalent to the transfers made to Ladehoff. Even if reasonably equivalent value is shown, the allegation that the transfers were made with actual intent to hinder, delay, or defraud cannot be overcome without the court's consideration of all relevant facts and circumstances. *Blood v. Nofzinger*, 162 Ohio App.3d 545, 834 N.E.2d 358, 368 (2005) (consideration of actual intent is not limited to statutory badges of fraud, but must be determined based upon facts and circumstances of each case).

Furthermore, a critical issue of fact exists as to whether the payments by Amcast were actually required under the terms of the Executive Agreement and Trust Agreement. The Liquidating Trustee al-

---

**20.** The cited cases were either decided under the prior analogous statute, the Ohio Uniform Fraudulent Conveyance Act ("Ohio UFCA"), or they rely upon cases interpreting that prior law. The current Ohio UFTA, like the Bankruptcy Code, refers to "transfers" rather than "conveyances," and it replaced the concept of "fair consideration" contained in the Ohio

UFCA with "reasonably equivalent value." *See Aristocrat Lakewood Nursing Home v. Mayne*, 133 Ohio App.3d 651, 729 N.E.2d 768, 775 (1999); *Profeta v. Lombardo*, 75 Ohio App.3d 621, 600 N.E.2d 360, 362 (1991); UNIFORM FRAUDULENT TRANSFER ACT prefatory note, § 4 cmt. (2) (1984).

leges in the Complaint that Amcast was insolvent or in the zone of insolvency at the time the transfers were made. [Complaint, ¶ 53.] Under the terms of the Trust Agreement, all payments to benefit participants were to cease upon Amcast's insolvency.[21] [Complaint, ¶ 39 and Ex. D, Sections 6.1–6.2.] Arguably, any payments made to Ladehoff at or after the point that Amcast became insolvent were payments made without legal justification or reasonable consideration since they would not have been due under the terms of the parties' negotiated agreements.

The court recognizes that Ladehoff and the other Defendants vehemently deny that Amcast was insolvent during the restructuring of the benefits or when the transfers to Ladehoff were paid. However, as noted previously in this decision, the court is precluded from considering extraneous facts conflicting with those in the Complaint on a Rule 12(b)(6) dismissal motion. *Perry*, 90 Fed.Appx. at 861.

The factual issues that exist regarding whether the transfers to Ladehoff were appropriately paid pursuant to the terms of the parties' agreements and whether Amcast was insolvent at the time of the transfers are not properly resolved on a Rule 12(b)(6) motion to dismiss. As such, the Liquidating Trustee states a fraudulent transfer claim against Ladehoff under provisions of the Ohio UFTA.

### I. Count Eight: Turnover of Property of the Debtor's Estate—Claim Against Defendant Leo Ladehoff

In his eighth claim for relief, the Liquidating Trustee seeks turnover of the transfers Ladehoff received pursuant to 11 U.S.C. § 542. The Liquidating Trustee asserts that because the transfers Ladehoff received were not payable under the terms of the Executive and Trust Agreements, they were "wrongful" and remained property of Amcast's estate subject to turnover.

In his motion to dismiss, Ladehoff asserts that Amcast did not retain any legal or equitable interests in the funds after they were transferred to him so the funds are not property of the estate. To the extent that the Liquidating Trustee asserts that the transfers were "wrongful" because they constitute fraudulent transfers, the funds are not considered property of the estate until the Liquidating Trustee obtains a judgment that the transfers were fraudulent transfers. In other words, Ladehoff argues that turnover under § 542 cannot be used as an alternative action to a fraudulent transfer claim. Otherwise, a plaintiff could use turnover to avoid the fraudulent transfer statute of limitations.

The court agrees with Ladehoff and will dismiss the Liquidating Trustee's § 542 turnover claim as a separate cause of action. Bankruptcy Code Section 542(a) provides in part that "an entity ... in possession, custody or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title ... shall deliver to the trustee, and account for, such property or the value of such property[.]" 11 U.S.C. § 542(a). This section requires anyone holding property of the estate to deliver it to the trustee.

---

**21.** At least two different definitions of "insolvency" may be applicable to this analysis. "Insolvency" for bankruptcy and fraudulent transfer purposes is generally based on a "balance sheet" test, i.e., whether the sum of the debtor's debts are greater than the debtor's assets at a fair valuation. *See* Ohio Rev. Code § 1336.02; 11 U.S.C. § 101(32). The Trust Agreement requires a cessation of payments upon the Company's insolvency which it defines as the Company's inability to pay its debts as they come due or being subject to bankruptcy proceedings.

*In re Greer,* 242 B.R. 389, 393 (Bankr. N.D.Ohio 1999). In order to prevail in a turnover action, the trustee must show: (1) the property sought to be recovered is property of the estate, and (2) the trustee is entitled to use, sell or lease the property pursuant to 11 U.S.C. § 363. *Id.*

 Recovery under 11 U.S.C. § 542 is limited to assets that are undisputedly property of the estate. *Stanziale v. Pepper Hamilton LLP (In re Student Finance Corp.),* 335 B.R. 539, 554 (D.Del. 2005). Thus, a § 542 action may be used to compel turnover of estate property whose transfer from the estate has been avoided and ownership is no longer in dispute. *Id.* However, a turnover action cannot be used to demand the return of assets subject to a title dispute or an unavoided transfer. *Id. See also In re Saunders,* 101 B.R. 303, 305 (Bankr.N.D.Fla.1989) (holding that until a judicial determination has been made that property was, in fact, fraudulently transferred, it is not property of the estate subject to a turnover action; otherwise, a § 542 turnover action could be used to avoid the statute of limitations on a fraudulent conveyance claim). Consequently, to state a claim for turnover, the plaintiff must allege that the transfer of funds has already been avoided or that the property is otherwise the undisputed property of the estate. *Student Finance Corp.,* 335 B.R. at 554.

The Liquidating Trustee has not yet avoided the transfers to Ladehoff and whether those funds constitute property of the estate remains an issue in dispute. Consequently, the Liquidating Trustee fails to state a separate claim for turnover under 11 U.S.C. § 542 and this claim is properly dismissed.

**J. *Count Nine: Avoidance***

***Count Ten: Preservation for the Benefit of the Estate***

In these counts, the Liquidating Trustee requests that any transfers avoided pursuant to 11 U.S.C. § 544 be recovered pursuant to 11 U.S.C. § 550 and preserved for the estate pursuant to 11 U.S.C. § 551.[22] The Defendants argue that these derivative claims fail because their related claims should be dismissed. However, the court has already determined that the Liquidating Trustee has sufficiently stated claims pursuant to state law and 11 U.S.C. § 544. Consequently, the Liquidating Trustee's derivative claims withstand the Defendants' motions to dismiss.

**K. *Count Eleven: Constructive Trust—Claim Against Defendant Leo Ladehoff***

***Count Twelve: Accounting***

With Count Eleven, the Liquidating Trustee seeks the imposition of a constructive trust on any transfers avoided and recoverable from Ladehoff. With Count Twelve, the Liquidating Trustee requests an accounting of all transactions during relevant times to determine the amounts recoverable by the Liquidating Trustee for unsecured creditors. Ladehoff argues that these claims should be dismissed because both a constructive trust and an accounting are remedies rather than distinct causes of action. In response, the Liquidating Trustee concedes that they are remedies. However, because he prop-

---

**22.** In the Complaint, the Liquidating Trustee's Count Ten contains a typographical error referring to 11 U.S.C. § 550 of the Bankruptcy Code as the section preserving avoided transfers for the estate. Count Ten should be corrected to reference 11 U.S.C. § 551. The Liquidating Trustee may correct this error in an amendment to the Complaint, but in any event, the court shall deem it so corrected.

erly pleads the underlying causes of action, the Liquidating Trustee requests that these claims be allowed to stand or that the court permit him to amend the Complaint and properly plead them as remedies.

 Ladehoff is correct that requests for an accounting and imposition of a constructive trust do not describe independent causes of action and are properly dismissed. *See Poss v. Morris (In re Morris )*, 260 F.3d 654, 667 (6th Cir.2001) (describing a constructive trust as a remedy used by courts for the prevention of fraud, unjust enrichment or other inequitable conduct); *Dibbern v. Adelphia Communications Corp. (In re Adelphia Communications Corp.)*, 331 B.R. 93, 100 (S.D.N.Y. 2005) (affirming bankruptcy court's dismissal of counts seeking an accounting and imposition of a constructive trust because they are not independent causes of action); *Del–Met Corp.*, 322 B.R. at 829, 836. However, the court will allow the Liquidating Trustee to amend the Complaint and properly plead them as remedies under our liberal pleading rules. *See* Fed. R. Bankr.P. 7015(a).

For these reasons, Counts Eleven and Twelve are dismissed.

## L. *Defendants' Defense of In Pari Delicto*

 As a final matter, the Defendants request dismissal of all of the Liquidating Trustee's claims based on the defense of *in pari delicto*. *In pari delicto* is an equitable defense that refers to the plaintiff's participation in the same wrongdoing as the defendant. *Terlecky v. Hurd (In re Dublin Securities, Inc.)*, 133 F.3d 377, 380 (6th Cir.1997). It is short for *"in pari delicto potior est conditio defendentis"* which means that "where the wrong of both parties is equal, the position of the defendant is the stronger." *Del–Met*

*Corp.*, 322 B.R. at 818. *See also Official Committee of Unsecured Creditors v. Austin Financial Services, Inc. (In re KDI Holdings, Inc.)*, 277 B.R. 493, 517–18 (Bankr.S.D.N.Y.1999) (quoting *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985)). In essence, it prevents one wrongdoer from recovering from another because each should bear the consequences of their wrongdoing without legal recourse against the other. *KDI Holdings, Inc.*, 277 B.R. at 518. "The doctrine is based on two premises: courts should not mediate between two wrongdoers, and denying judicial relief to a wrongdoer deters illegal conduct." *Id.*

The Defendants argue that because the Liquidating Trustee is pursuing Amcast's claims, he stands in the shoes of Amcast and is subject to any defenses the Defendants could raise against Amcast. They further assert that the defense of *in pari delicto* is applicable against Amcast because any malfeasance the court might determine that the Defendants engaged in as officers and directors is directly attributable to Amcast itself making it a participating wrongdoer. *Dublin Securities, Inc.*, 133 F.3d at 380. In essence, the Defendants argue that *in pari delicto* prevents the Liquidating Trustee from suing the Defendants for wrongdoing that can be attributed to Amcast.

The Defendants are only partially correct in their analysis. There is Sixth Circuit support for the Defendants' argument that *in pari delicto* is a defense that may be raised against a bankruptcy trustee to the extent the defense could be raised against a debtor itself. *Id.* at 380–81; *In re Donahue Securities, Inc.*, 304 B.R. 797, 799 n. 4 (Bankr.S.D.Ohio 2003).

 However, the defense is not applicable to bar the claims of the Liquidating

Trustee in this case because the Defendants, as officers and directors, are insiders of Amcast. While *in pari delicto* may be used as a defense to bar a corporation or successor bankruptcy trustee's claims against third parties, it does not apply to bar claims against corporate insiders. *Oakwood Homes Corp.*, 340 B.R. at 536; *Official Committee of Unsecured Creditors v. Shapiro*, 2001 WL 1468250, at *1 (E.D.Pa. Nov.16, 2001); *KDI Holdings, Inc.*, 277 B.R. at 518; *Goldin v. Primavera Familienstiftung (In re Granite Partners, L.P.)*, 194 B.R. 318, 332 (Bankr.S.D.N.Y. 1996). *See also Greater Southeast Community Hosp.*, 333 B.R. at 538–39 (holding that corporate fiduciary defendants such as directors and officers cannot assert the *in pari delicto* defense against claims for breach of fiduciary duty). Otherwise, neither a corporation nor the successor bankruptcy trustee could sue the corporation's insiders on account of their own wrongdoing. *Granite Partners*, 194 B.R. at 332.

In the Complaint, the Liquidating Trustee pleads that the Defendants are former officers and/or directors of Amcast and, thus, corporate insiders. Therefore, *in pari delicto* does not bar the Liquidating Trustee's claims against the Defendants.

### *CONCLUSION*

For the reasons stated above, the court **GRANTS**, in part, and **DENIES**, in part, the Defendants' Motions to Dismiss to the following effect:

1) The Liquidating Trustee's Complaint sufficiently states the following claims and, consequently, **these claims are not dismissed and remain pending for trial:**

A) Breach of Fiduciary Duty to the Corporation (Count One);

B) Aiding and Abetting Breaches of Fiduciary Duties (Count Two);

C) Negligence (Count Three);

D) Conversion (Count Four);

E) Unlawful Distribution and Waste of Corporate Assets (Count Five);

F) Fraudulent Transfers Under Ohio Law (Count Seven);

G) Avoidance (Count Nine); and

H) Preservation for the Benefit of the Estate (Count Ten).

2) The Liquidating Trustee's Complaint fails to state the following claims and **these claims are dismissed:**

A) Breach of Fiduciary Duty to Creditors (Count One);

B) Deepening Insolvency (Count Six);

C) Turnover of Property of the Estate (Count Eight);

D) Constructive Trust (Count Eleven); and

E) Accounting (Count Twelve).

3) The court concludes that the Defendants' defense of *in pari delicto* does not apply to bar the Liquidating Trustee's claims in this case.

4) The court will allow the Liquidating Trustee to amend the Complaint and properly plead the remedies of constructive trust and an accounting.

**SO ORDERED.**